## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| NEIL F. LURIA, IN HIS CAPACITY AS LIQUIDATING TRUSTEE OF THE SHARITY MINISTRIES, INC. LIQUIDATING TRUST, and ALIERA LT, LLC, AS LIQUIDATING TRUSTEE FOR THE ALIERA COMPANIES, INC. LIQUIDATING TRUST | **Case No.** _____ <br><br> **COMPLAINT FOR DAMAGES** <br><br> **Jury Trial Demanded** |
|          Plaintiffs, <br><br> v. <br><br> BURR & FORMAN, LLP, an Alabama Limited Liability Partnership; and JENNIFER M. MOSELEY, <br><br>          Defendants. | |

## I.      NATURE OF THE ACTION

1.      This is an action for professional malpractice, breach of fiduciary duty, and contribution against Burr & Forman LLP, for its negligence and breaches of fiduciary duty in representing Sharity Ministries, Inc., a now bankrupt corporation to which the Sharity Ministries, Inc. Liquidating Trust is the successor; for having aided and abetted Aliera Healthcare, Inc. and its insiders to breach fiduciary duties that they owed to Sharity; and for having aided and abetted Aliera's insiders to breach the fiduciary duties that they owed to The Aliera Companies, Inc., a now

bankrupt corporation to which the Aliera Companies, Inc., Liquidating Trust is the successor.

2.      The founders of The Aliera Companies Inc., Tim Moses and Shelley Steele ("Insiders"), devised a fraudulent scheme to lure thousands of people around the country into making monthly "contributions" to purchase health plans. These plans promised benefits equal to traditional health insurance plans, while claiming that the coverage was not insurance (and not regulated by state insurance departments). Ultimately, the plans did not provide many of the health benefits promised, leaving thousands of members without coverage and with devastating medical bills. The scheme is described in detail in *LeCann, et al., v. The Aliera Companies, Inc.*, No. 1:20-cv-2429-AT, 2021 U.S. Dist. LEXIS 115827 (N.D. Ga. June 22, 2021)

3.      With the help of their law firm, Burr Forman and one of its partners, Jennifer Moseley (collectively "Defendants"), the Insiders carried out a massive fraud using two corporations, Aliera, a for profit entity, and Sharity (originally known as Trinity Healthshare, Inc.), a nonprofit entity. The Insiders controlled both entities in order to siphon off millions to a web of LLCs created with Defendants' assistance, leaving both Aliera and Sharity subject to regulatory actions, owing

enormous debts to Sharity members and rendering both companies bankrupt. Defendants' negligence was the proximate cause of the losses alleged herein.

## II.    PARTIES

4.    NEIL F. LURIA is the duly appointed trustee of the Sharity Ministries, Inc. Liquidating Trust ("Sharity Trust"). He is a citizen of Florida. The Sharity Trust was created pursuant to a Plan of Liquidation approved by the Bankruptcy Court for the Federal District of Delaware in *In re Sharity Ministries, Inc.,* Case No. 21-11001 (JTD). Until July 27, 2020, Sharity Ministries, Inc. ("Sharity") operated under the name Trinity Healthshare, Inc. ("Trinity"), and because it used the Trinity name at the time the majority of the actions alleged here occurred, will be referred to primarily as "Trinity." Mr. Luria (the "Sharity Trustee") brings this action on behalf of the Sharity Trust as the assignee of all claims and causes of action under the Plan of Liquidation. Pursuant to the Plan of Liquidation, the Sharity Trustee has standing to bring claims on behalf of the Sharity bankruptcy estates as well as the Sharity creditors pursuant to 11 U.S.C. § 544.

5.    ALIERA LT, LLC ("Aliera Trustee") is the duly appointed Trustee of the Aliera Liquidating Trust ("Aliera Trust"). The Aliera Trustee is a California limited liability corporation with a principal place of business in Brentwood, Tennessee. The Aliera Trust was created pursuant to a Plan of Liquidation approved

by the Bankruptcy Court for the Federal District of Delaware in *In re The Aliera Companies, Inc.,* Case No. 21-11548 (TMH), ECF No. 576 (the "Confirmation Order"). The Aliera Trustee brings this action on behalf of the Aliera Trust as the assignee of all claims and causes of action under the Plan of Liquidation. It was appointed pursuant to an order entered by the Delaware Court, Bankruptcy Cases, ECF No. 576 (the "Confirmation Order"), confirming the *Modified First Amended Plan of Liquidation*, attached as Exhibit A to the Confirmation Order (together with all exhibits thereto, and as may be amended, modified, or supplemented, the "Plan"). Pursuant to the Plan, the Aliera Trustee has standing to bring claims on behalf of the Aliera bankruptcy estates as well as the Aliera creditors pursuant to 11 U.S.C. § 544.

6.    BURR & FORMAN LLP ("Burr") is a law firm, organized as an Alabama limited liability partnership, with a principal place of business in Alabama. According to its website, it has 350 attorneys in Alabama, Delaware, Florida, Georgia, Mississippi, North Carolina, South Carolina, and Tennessee. Burr engaged in the acts and omissions alleged primarily in Georgia, out of its Atlanta office.

7.    JENNIFER M. MOSELEY is a partner in Burr's Atlanta office and is believed to be a resident of Georgia. The legal work that this complaint describes as having been performed by Burr was performed, coordinated, or directed by Moseley

or others under her supervision. Moseley's acts and omissions that this complaint describes were hers and Burr's acts and omissions.

## III.    JURISDICTION AND VENUE

8.    The Plaintiffs and the Defendants in this case are citizens of different states, and the amount in controversy exceeds $75,000. This Court has jurisdiction pursuant to 28 U.S.C. § 1332.

9.    Venue is appropriate in this District where the majority of the acts and omissions alleged occurred pursuant to 28 U.S.C. § 1391(b)(2).

## IV.    FACTUAL ALLEGATIONS

### A.    Health Care Sharing Ministries

10.    When Congress passed the Affordable Care Act in 2010, it included an "individual mandate" in that law, requiring most Americans to purchase "minimum essential [health insurance] coverage"—or else pay a tax "penalty." 26 U.S.C. § 5000(a)-(b). The individual mandate contained, however, certain limited exceptions. One was for members of a qualifying tax-exempt "health care sharing ministry" ("HCSM"), defined as an organization:

- "which is described in [Internal Revenue Code] section 501(c)(3) and is exempt from taxation under section 501(a),"

- "members of which share a common set of ethical or religious beliefs and share medical expenses among members in

accordance with those beliefs and without regard to the State in which a member resides or is employed,"

- "members of which retain membership even after they develop a medical condition,"

- "which (or a predecessor of which) has been in existence at all times since December 31, 1999, and medical expenses of its members have been shared continuously and without interruption since at least December 31, 1999," and

- "which conducts an annual audit which is performed by an independent certified public accounting firm in accordance with generally accepted accounting principles and which is made available to the public upon request."

26 U.S.C. § 5000A(d)(2)(B)(ii)(I-V).

11.    The statutory definition of an HCSM requiring its formation before 2000 serves two important legislative purposes:  by preventing new entrants it (1) ensures reliability of care that comes with historical practice, and (2) prevents "opening the flood gate" to new and opportunistic groups that might avail themselves of the exception "to circumvent the requirements of the ACA." *Liberty Univ. v. Lew*, 733 F.3d 72, 102 (4th Cir. 2013).

12.     Many states also exempt *bona fide* health sharing ministries from state insurance regulation.

13.    The exception, however, provided an opportunity for unscrupulous business people to profit from unsuspecting individuals who needed coverage for health care needs. One of those was Timothy Moses—aided and abetted by Burr.

**B.    Tim Moses, Ex-Felon, and His Wife Form Aliera, Discover HCSMs, and Engage Moseley**

14.    In 2015, Timothy Moses was a felon just coming off a criminal sentence for securities fraud and perjury, for which he had served 6.5 years in prison, followed by five years of supervised release, felonies for which he was ordered to pay $1.65 million in restitution. *United States v. Moses,* No. 1:04-cr-00508-CAP-JMF (N.D. Ga.). The Eleventh Circuit affirmed Moses's convictions and sentence. *United States v. Moses,* 219 F. App'x 847 (11th Cir. 2007). In May 2014, the District Court revoked Moses's supervised release after he failed to disclose financial information to his probation officer.

15.    In 2015, shortly after completing his sentence, Moses and his wife Shelley Steele formed Aliera Healthcare, Inc. ("Aliera"), and began selling limited health care plans to businesses and individuals, which led Moses soon to realize the profit potential in selling HCSMs. Moses located Anabaptist Healthshare, Inc. ("Anabaptist"), a small HCSM operated for members of the Mennonite community, mainly in and around Aroda, Virginia. Anabaptist was a 501(c)(3) entity that had been recognized as an HCSM by the Centers for Medicare and Medicaid Services.

Anabaptist was a modest operation with about 800 members and assets of about $48,000. Anabaptist was being run mostly out of a home office by Tyler Hochstetler and his father. Moses proposed to the Hochstetlers to vastly grow their HCSM through a relationship with Aliera.

16.    The Hochstetlers agreed, and the Insiders, through Aliera, and Anabaptist entered into a Memorandum of Understanding in November 2016, after which Anabaptist created Unity Healthshare, Inc. ("Unity") as a wholly-owned subsidiary and as the vehicle for selling HCSM plans with Aliera. The Insiders, through Aliera, began selling Unity HCSM plans soon thereafter. Unity and Aliera entered into a definitive agreement in February 2017. Under that agreement, Aliera created, designed, marketed and sold healthcare plans under the Unity name, and administered all claims. Under the agreement, *Aliera, not Unity, collected all monthly payments from members, calling them "contributions."* Contributions were essentially premium payments under traditional insurance. Because they were collected by Aliera and deposited into a single account controlled by Aliera, Moses and Steele had ready access to those funds.

17.    The Insiders, through Aliera, were extremely successful at selling the Unity HCSM plans. Cash into Aliera's account skyrocketed. For the entire year of 2016, Aliera received approximately $2.3 million in revenue. But by mid-2017, it

was depositing $2.5 million *per month* into its bank account from selling Unity plans. Unfortunately for Unity and its members, Aliera set aside very little of these funds for the payment of Unity members' medical claims.

18.    Moses and Steele were suddenly awash in cash, which they regarded as their own. They sought out sophisticated legal counsel to assist them in corporate structuring and estate planning. In March 2017, they engaged Jennifer Moseley, then a principal at Morris Manning Martin. Shortly after, Ms. Moseley joined Burr as a partner. Moseley and Burr were soon advising the Insiders on how to structure payments to themselves to minimize taxes and on setting up captive insurance companies.

**C.    Moseley and Burr Assisted the Insiders in Breaching their Fiduciary Duties to Aliera and Siphoning Funds From Aliera For their Own Benefit.**

19.    In June 2017, at Moseley's direction, Burr created and filed formation documents for Shelley Steele for Burdette Atlanta, LLC ("Burdette"). Steele was the sole member of Burdette. Burdette was created to hold title to a luxury residence. Steele quickly diverted over $2 million from the Aliera accounts holding member deposits to purchase that home.

20.    In June 2017, at Moseley's direction, Burr also created and filed formation documents for Shelley Steele for another corporation, this one formed as

First Call Telemedicine, LLC ("First Call). Steele was likewise the sole member of First Call, which was purportedly created to provide telemarketing services to Unity members. Moseley drafted an agreement between First Call and Aliera through which Aliera would pay First Call for telemarketing services. In reality, First Call provided no services, but contracted with a third party which provided those services for substantially less than the amount First Call charged Aliera, allowing Steele to pocket the difference. In 2018, Steele transferred over $500,000 from First Call to herself, and transferred another $75,000 to Burdette.

21.    In early 2018, at Moseley's direction, Burr created two more entities wholly owned by Shelley Steele—Reynolds Oconee LLC ("Reynolds"), created on April 6, 2018, and JDWalton Newnan LLC ("JDWalton") created on May 23, 2018. Like Burdette, these entities were created and owned by Steele for the purpose of holding title to real property. Reynolds held title to lakefront property Steele purchased in April 2018, and JD Walton held title to a horse farm Steele purchased in June 2018. Those properties were purchased with funds Steele transferred from Aliera, paid by Unity members for health coverage—and used, instead, by Steele to purchase properties for herself.

22.    In July 2018, at Tim Moses's request, Moseley drafted a "Services Agreement" between Aliera and Ciel Capital Group, Inc. ("Ciel"). Under that

Services Agreement, Ciel would provide vaguely defined advisory services to Aliera, and Ciel could bill for those services back to January 1, 2018. In September 2018, Burr filed incorporation documents in Delaware forming Ciel. Shelley Steele was the nominal owner of Ciel. In reality, Ciel was another entity devised to allow Moses to siphon money from payments in Aliera's bank accounts that had been received through its nonprofit HCSM partners' members. In October 2018, Aliera transferred $3,654,810 to Ciel from the account into which member deposits were made. In 2019, Moses transferred $1.65 million from Ciel to pay his criminal restitution judgment from his securities fraud and perjury conviction in addition to loaning $975,000 to his son Chase—again using funds contributed by members to purchase health coverage.

23.    Months after these transfers were made, Moseley papered over the transfers by drafting promissory notes from Shelley Steele to Aliera for over $8 million. Moseley knew, or should have known, that there was no business reason for Aliera to "loan" the Insiders over $8 million.

**D.    The Unity/Aliera Health Plans Were Illegal, Unauthorized Insurance**

24.    As operated by Aliera, Unity's operations were a sham. The Insiders, through Aliera, held out Unity as an independent entity operating as an HCSM. But in fact, Aliera exercised near complete control over Unity. Members' contributions

were received by Aliera, not Unity (or Anabaptist). They were deposited into an account Aliera controlled, for which Timothy Moses, Shelley Steele, and their son, Chase Moses had signature authority. The Insiders, through Aliera, controlled and managed all cash receipts and disbursements, rather than Unity (or Anabaptist). And outsized shares of member contributions, rather than being used for medical costs, were extravagantly diverted for other purposes instead.

25.     From the outset, Aliera helped itself to so large a share of Unity's members' contributions as to endanger Unity's financial stability, jeopardize Anabaptist's 501(c)(3) status, and effectively ensure Unity's inability to cover members' future medical costs.

26.     In October 2017, the Maryland Insurance Commissioner issued an order holding Aliera in violation of insurance laws in its sales of Unity products in that state. Aliera entered into a consent order with that Insurance Commissioner in April 2018 agreeing to cease selling products in that state and to pay a fine.

**E.     Aliera's Relationship with Anabaptist/Unity Ends in Litigation**

27.     By early 2018, Aliera's relationship with Anabaptist/Unity began falling apart. Aliera was pushing for a contract that would have given it an even larger cut of the funds, and Moseley drafted a new agreement that would accomplish that. Anabaptist, however, refused to enter into it. So, Moses and Aliera unilaterally

increased their allocation of member contributions anyway, "keeping as much of the incoming member funds for Aliera's own benefit" as Moses "saw fit." *Aliera Healthcare, Inc. v. Anabaptist Healthshare*, 355 Ga. App. 381, 384, 844 S.E.2d 268, 273 (2020). Aliera was neither segregating nor properly accounting for Unity's and its members' funds. And Moses, with signing authority over Unity's operating account, wrote almost $150,000 in checks to himself for personal use.

28.    Moseley was aware of Moses's and Aliera's misuse of Unity funds. On or about May 4, 2018, Moseley called Anabaptist's Tyler Hochstetler and told Hochstetler what Moses had been doing. On July 25, 2018, Anabaptist and Unity instructed Aliera to immediately turn over control of Unity's funds to Unity. Aliera refused. Three weeks later, Anabaptist and Unity sent Aliera a notice terminating their agreement and again demanded that Aliera return control over Unity's HCSM plan funds and also demanded, this time, that Aliera provide the Unity HCSM member roster to Unity. Again, Aliera refused.

29.    Aliera and Anabaptist/Unity sued each other in the Superior Court of Fulton County, Georgia in August 2018 in *Aliera Healthcare v. Anabaptist Health Share, et al.,* No. 2018-cv-308981 ((the "Fulton County Lawsuit"), where a Fulton County Superior Court Judge (Hon. Alice D. Bonner, ruled that:  (a) Aliera owed a fiduciary duty to Unity which it had likely breached, (b) Aliera had demonstrated a

lack of transparency with respect to the Unity HCSM plans and funds, (c) Aliera's course of conduct "evinces a threat of misappropriation of the plan assets," and (d) Aliera's failure to account for Unity funds supported the appointment of a receiver to oversee Unity's HCSM plan assets and to protect Unity and its members from further looting by Aliera and Moses.

**F.    Burr Assists Aliera and Moses in Forming Trinity Healthshare, Inc. and Filing for Tax Exempt Status Under False Pretenses**

30.    As Aliera's disputes with Anabaptist and Unity were reaching a crisis point, Burr assisted the Moses family in replacing Unity with a new purported HCSM entity, one that would be more captive and yielding than Unity and Anabaptist. The goal was to replace Unity with a new entity that would give Aliera and the Moses family nearly unrestrained access to, and control over, money collected from the nonprofit HCSM members.

31.    Before creating Trinity, Burr knew, or should have known, about Aliera's oppressive misconduct toward Unity. It knew that Timothy Moses had written checks to himself for about $150,000 out of the Unity operating account without Anabaptist and Unity's knowledge or authorization. It knew about Aliera's commingling of Unity and Aliera funds. It knew, or should have known, that it created entities for the Moses family to use as vehicles for removing cash from Aliera and from Unity member payments that should have been set aside for their

medical claims. It knew, or should have known, that Aliera exercised control and influence over Unity to the extent of preventing Unity from fully pursuing its own separate interest, and it knew, or should have known, that Aliera planned to ensure even greater control over Trinity. It also knew, or should have known, that Aliera would not allow Trinity to seek competitive bids for service providers but instead would sign a management contract with Trinity (which Burr would draft and induce William Thead, an Aliera employee, to sign on behalf of Trinity). It knew, or should have known, that this management agreement would require Trinity to contract for all services with Aliera affiliates at supra-competitive rates. Yet with that knowledge, Burr nonetheless negligently aided Aliera's formation of Trinity—without advising Trinity about these facts or the risks Burr created. From the day it created Trinity (if not before), Burr knew, or should have known, that it was participating in forming an entity that would be used to perpetrate a fraud.

32. At Moses's behest, Burr drafted and filed papers to create Trinity Healthshare, Inc. (Trinity) as a nonprofit HCSM to replace Unity. Moseley knew, or should have known, that under the federal ACA, an entity did not qualify as an HCSM if it did not exist before December 31, 1999, and admitted that a newly-created entity like the one Moses insisted on creating "could be considered insurance." Even though the new entity was created at Moses's request, he wanted

to ensure his fingerprints were not visible, requesting, through his assistant, that Trinity be incorporated "anonymously."

33.    On June 27, 2018, Burr prepared and filed a Certificate of Incorporation with the Secretary of State of Delaware for Trinity Healthshare, Inc., a "Non-Stock Corporation." A Burr paralegal is identified as Trinity's "sole incorporator." The Certificate of Incorporation represented that Trinity was being organized "exclusively for charitable and religious purposes under section 501(c)(3) of the Internal Revenue Code." As Defendants knew, or should have known, that statement was false. Trinity was, in fact, being incorporated to serve Burr's for-profit client Aliera, and to enter into an agreement with Aliera that would allow Aliera to control Trinity's business and assets.

34.    After incorporating Trinity, Burr filed a form with the IRS to obtain an employer identification number. As Moseley's paralegal advised Moses, the form needed to be signed by the "Responsible Party," identified as the person with "a level of control over, or entitlement to, the funds or assets in the entity that, as a practical matter, enables the person, directly or indirectly, to control manage or direct the entity and the disposition of its funds and assets." Moses offered up William Thead as the "responsible party" to sign the documents. Thead was an Aliera employee, and a personal friend of the Moses family. He was also described as a "pastor." As

Moseley and Burr knew, or should have known, Moses had no intention of allowing anyone outside of Aliera to control the funds and assets of the newly-formed Trinity, because the reason Moses wanted it formed was so that Aliera could control it.

35.    On July 3, 2018, Moseley filed with the Internal Revenue Service an Application for Recognition of Exemption under Section 501(c)(3) on behalf of Trinity and Burr paid the $600 application fee. A true copy of that Application is attached as **Exhibit 1.** The Application included (a) a Power of Attorney and Declaration of Representative authorizing Moseley and her partner to represent Trinity before the IRS; (b) IRS Form 1023 (the application), on which Moseley listed herself as the primary contact for the new entity; (c) a conflict of interest policy; (d) the Certificate of Incorporation described above; and (e) bylaws for the new entity.

36.    The IRS Form 1023 Application, Bylaws, and Conflict of Interest Policy were originally created by Moses or his assistant by copying in large part documents Anabaptist had filed for recognition as a 501(c)(3) exempt organization. Moses's assistant sent the completed forms, signed by Thead, to Moseley on June 28, 2018. Moseley, along with her nonprofit partner, reviewed and edited the forms, and filed them with the IRS on July 3, 2018. At no time before filing did they ever communicate with Thead.

37. In helping Trinity make an application for a ruling that it was qualified for tax-exemption as a 501(c)(3) entity, Burr knowingly or negligently failed to address that Trinity's operations would further at least three substantial non-exempt purposes: (i) enriching Aliera and the Insiders, (ii) directly competing with commercial insurance companies, and (iii) defrauding Trinity's members. Instead, Burr filed a fraudulent IRS Form 1023, the Application for Recognition of Exemption.

38. In that Form 1023, Burr knowingly or negligently concealed Trinity's relationship with Aliera, made multiple misrepresentations, and omitted material facts. For example, the application:

(a) Failed to disclose Aliera as an entity that would receive compensation "of more than $50,000 per year." **Exhibit 1,** Part V, Question 1c. Burr knew, or should have known, that Aliera had no interest in forming an entity through which it received less than $50,000 per year. In fact, Aliera paid itself over $32 million from Trinity funds in the first year-and-a-half of Trinity's existence. As Moseley knew, or should have known, Trinity would never have been formed at all but for its ability to generate far more compensation to Aliera than merely $50,000 per year.

(b)    Failed to disclose that Trinity would compensate independent contractors "through non-fixed payments … such as revenue-based payment. *Id*., Part V, Question 6a. In fact, Aliera's compensation would be based largely on a percentage of the amount of member premiums received. Defendants either knew, or should have known, this fact.

(c)    Failed to disclose that Trinity planned to purchase services from its "highest compensated independent contractor" (Aliera) that would not be negotiated at arms-length, and that no fair market value for the contract would be determined. *Id.,* Part V, Question 7a. Instead, it represented that Trinity would have no contracts or agreements with "highly compensated independent contractors." *Id*., Part V, Question 8a.  Defendants either knew, or should have known, that it would, in fact, have contracts with "highly compensated independent contractors."

(d)    Failed to present "good faith projections" of Trinity's revenues and expenses for 2018, 2019, and 2020. *Id*., Part IX. The Form 1023 projected Trinity's annual revenues at less than $700,000 and expenses at less than $600,000 for the first three years. Aliera had been receiving over $20 million per month through payments for the Unity plans, and it created Trinity as a replacement for Unity. While the application was pending with the IRS, Burr was presented fee schedules from Aliera based on Trinity's receipt of $50 million in revenue per year.

Trinity would later report revenues of more than $90 million and expenses of more than $38 million. As Burr knew, or should have known, if Aliera expected that the much lower projections on Form 1023 had been anywhere close to actual expectations, Aliera would not have bothered to create Trinity.

39.     Had the application truthfully represented Aliera's relationship to Trinity, the IRS would not have recognized Trinity as a 501(c)(3) entity. Without that recognition, Aliera could not have used Trinity to perpetrate an insurance fraud scheme that left Trinity without the funds to pay for millions of dollars in member medical claims. Burr was negligent in the fraudulent creation of Trinity, upon which the insurance fraud relied, or, even worse, did so knowingly.

**G.    Acting Under an Unwaivable Conflict of Interest, Burr Represents Trinity and Commits Malpractice**

40.     Burr did not communicate with Thead until July 26, 2018, a month after creating Trinity and while Trinity's nonprofit application was pending with the IRS. On July 26, Moseley introduced herself to Thead through an email, and requested that he sign an engagement letter for the work that she had already performed and was performing, ostensibly on behalf of Trinity. Attached as **Exhibit 2** is a copy of the email. She noted that because Aliera was an ongoing client, her firm would be representing Aliera in the drafting and negotiation of an agreement between Trinity and Aliera and included a conflict waiver in the engagement letter. The agreement

stated both that "Our [Burr's] representation will be deemed effective as of June 26, 2018 [thirty days earlier] upon your [Trinity's] acceptance of this engagement letter" and that "[Y]ou [Trinity] are agreeing to waive any conflicts of interest that may arise as a result of this firm's representation of Aliera in matters related to Trinity, even if the matter is directly adverse to you." A copy of the engagement letter is attached as **Exhibit 3.**

41.    At the time Burr created Trinity and filed the Form 1023 application with the IRS, Moseley was already contemplating terms of an agreement that would ensure that Aliera had better control over Trinity and its members than it had over Unity and its members. It had already created Trinity as a vehicle to serve Aliera. At the time Thead was presented with the engagement letter, a conflict had already arisen that was not disclosed.

42.    Moseley and Burr failed to provide Trinity or Thead the reasonable and adequate information in writing about the material risks of and reasonable available alternatives to their representation, as required by Georgia RPC 1.7(b) and RPC 1.0(1). In particular, they did not (a) suggest that Thead obtain separate counsel to review the engagement letter; or (b) provide Thead with any information about the nature of the conflict or the extent to which Aliera intended to control the nonprofit Trinity.

43.    In representing Trinity for purposes of its formation, Burr owed Trinity duties of care and loyalty, including the competence and diligence normally exercised by lawyers in similar circumstances. In participating in the formation of Trinity, Burr breached these duties, in particular, by failing to advise Trinity about any of these facts:

(a)    Aliera's prior commingling of Unity's and Aliera's funds (using a single bank account for both Unity and non-Unity member payments);

(b)    Timothy Moses's conversion of Unity's funds;

(c)    Timothy Moses's felony convictions for fraud and perjury;

(d)    The imprudence—or at a minimum, the risks for Trinity—of going into business with Aliera directly and Moses indirectly, considering Moses's history of fraud and perjury and Aliera and Moses's joint histories of commingling and wrongfully converting Unity's funds.

(e)    The legal impossibility—or at a minimum the risks—of trying to pass off Trinity as an HCSM given that Trinity had no plausible factual basis for claiming to satisfy either:

(i)    the "pre-1999" formation and continuous operation requirement for HCSMs under 26 U.S.C. § 5000A(d)(2)(B), or

(ii)    the IRS's operational test for 501(c)(3) tax-exempt status, given Aliera's substantial influence and control over Trinity;

(f)    The likelihood that state Departments of Insurance, Attorneys General, and courts would conclude that Trinity was illegally selling unauthorized insurance products.

(g)    Trinity's need for independent board members unbeholden to Aliera.

44.    In addition, Burr breached its duties to Trinity by negligently forming Trinity in a manner that all but ensured Trinity's demise. This negligence included Burr's:

(a)    Seeking a tax exemption for Trinity under false pretenses. Burr knowingly or negligently concealed from the IRS that Trinity had been organized and would operate primarily for the private benefit of and under the control of Aliera and the Moses family, and, therefore, both for non-exempt purposes and for private inurement; and

(b)    Creating Trinity as a purported HCSM even though Trinity neither satisfied the "pre-1999" formation and continuous operation requirement for

HCSMs, 26 U.S.C. § 5000A(d)(2)(B), nor had aligned itself with any predecessor church or organization claiming to meet that requirement.

45.    In addition, Burr committed legal malpractice:

(a)    By concurrently representing both Trinity and Aliera under circumstances where no disinterested lawyer would have believed that competent and diligent representation could be provided to both at the same time; and, if the conflict was waivable, by failing to obtain Trinity's ***informed*** consent to concurrent representation;

(b)    By taking no steps to ensure that Trinity would have reasonably active and competent management. Moseley and Burr either failed to inquire or turned a blind eye to the fact that Thead, their only Trinity contact and the new entity's only employee, had no relevant experience or background in operating healthcare sharing ministries, or in managing or administering nonprofit corporations or agencies (and would not be assisted by a controller or CFO—because Trinity had neither);

(c)    By failing to ensure that Trinity obtain D&O insurance—or even to advise Trinity to obtain D&O insurance. Given Trinity's risky structure and business model and Aliera's and the Moses family's histories of fraud and self-dealing, D&O insurance should have been deemed essential.

46.     After Thead signed the engagement agreement, Burr billed Trinity for its time spent incorporating Trinity and seeking tax-exempt recognition from the IRS, and Trinity paid Burr's bill.

47.     Burr continued to represent Trinity after the Form 1023 Application was filed. The Form 1023 Application was pending with the IRS through October 1, 2018, when it issued its determination letter that Burr forwarded to Thead on October 9, 2018. Burr filed corporate papers on behalf of Trinity with the Georgia Secretary of State in late October 2018.

48.     While the application was pending with the IRS, Burr turned to the longer-term goal—ensuring that Trinity, now nominally formed, would otherwise remain as a passive tractable entity existing almost exclusively to benefit Aliera and the Moses family.  Defendants therefore breached their legal duties to Trinity.

## H.     After Forming Trinity, Burr Immediately Enfeebled and Undermined Trinity by Imposing an Onerous Contract Favorable to Aliera

49.     Burr knew, or should have known, that Aliera and the Insiders failed to adequately safeguard and segregate funds it had received from Unity and its members. Yet Burr crafted an agreement that would require Trinity to surrender significantly *more* control to Aliera than Unity had surrendered. Moseley drafted the Management and Administration Agreement ("Management Agreement"), effective

August 13, 2018, that precluded Trinity from surviving as a standalone entity, prevented it from meeting its own fiduciary obligations to members, and abdicated autonomy and authority in favor of Aliera. A true and correct copy of that Management Agreement is attached as **Exhibit 4**. The consequences of that Agreement ultimately led to Trinity's filing for Chapter 11 protection.

50.    Burr knew, or should have known, that the Management Agreement was not an arm's length agreement and was never intended to be one. It was not negotiated, nor was it the result of a competitive bidding process. It was, in Moseley's words, "strongly favorable to Aliera." Signing this Management Agreement was against Trinity's interests. Yet Trinity did not have, nor did Burr advise it to get, any independent counsel representing it.

51.    Under that Management Agreement, as drafted by Burr, Trinity ceded to Aliera sole control over (i) the design of its healthcare plans; (ii) the marketing and sales of its healthcare plans; (iii) all payments made by members for the plans; (iv) the costs deducted from members' payments; and (v) the administration and payment of members' medical claims. In other words, Trinity ceded virtually all aspects of its business to Aliera. Burr induced, or substantially assisted Aliera to induce, Trinity to "agree" that:

(a)    All member contributions would be made payable to Aliera, not Trinity, directly into an Aliera bank account;

(b)    Aliera would be a signatory, authorized to make payments from, "each and all banking accounts opened in Trinity's name in connection with this Agreement;"

(c)    Aliera, "in its sole discretion," would accept (or reject) enrollment from members in Trinity's HCSM plan;

(d)    Aliera would hold "exclusive ownership rights to the [Trinity HCSM] Membership Roster;" and

(e)    Aliera would be the sole point of contact with Trinity 's members. Trinity was barred from contacting any of its members "for any purpose without the prior written consent of Aliera."

52.    Most notably, the Management Agreement's fee structure set Trinity up for failure. That fee structure allowed Aliera to siphon off 84% of members' contributions for various fees, commissions and expenses, leaving only 16% for allocation into a "sharebox" for payment of Trinity member medical claims. In contrast, the medical loss ratio for individual ACA-governed policies requires 80% of premiums to be paid for benefits. 42 U.S.C. § 300gg-18.

53.     The Management Agreement was contrary to the representations made in Trinity's Form 1023 that was pending before the IRS. Although Moseley advised Thead to update the pending application on a non-substantive matter—to change Trinity's address—she never advised him to correct the application to disclose the terms of the Management Agreement or the contractual relationship with Aliera. Burr did not advise him to correct the many false statements and omissions in the application. To do so would have been contrary to the wishes of Burr's other client, Aliera, whose principal Tim Moses was demanding action to expedite the IRS determination. Had such false statements been corrected, the I.R.S. would not have issued a determination letter.

54.     Aliera was a fiduciary for Trinity, being entrusted by Trinity with authority over Trinity's operations and assets.

55.     As a fiduciary, Aliera was legally constrained to negotiate its compensation for its services to Trinity at arm's length. It had a fiduciary duty not to extract excessive compensation. Aliera breached that duty. And Burr aided and abetted Aliera's breach of that fiduciary duty by drafting oppressive terms and inducing or substantially assisting Aliera to induce Trinity to allocate revenue to Aliera in amounts so disproportionately large that they bore no reasonable

relationship to Aliera's services and could not have been the product of arms' length bargaining.

56.    The extraordinary amounts that Aliera extracted from Trinity, while setting aside inadequate amounts to pay members' medical costs, could never work—as Burr knew, or should have known. And they did not work.

I.    **As a Result of Defendants' Malpractice and Aiding and Abetting Aliera's Breach of Fiduciary Duty, Trinity Became the Subject of Multiple Regulatory Actions and Lawsuits, and Ultimately Became Liable for Millions of Dollars in Unpaid Medical Expenses**

57.    Aliera began selling Trinity plans to the public by mid-August 2018. Within weeks, Trinity received an investigative demand from Washington State's Office of the Insurance Commissioner.

58.    Washington State's Insurance Commissioner issued a cease and desist order against Trinity and Aliera in May 2019, finding the products Aliera sold under Trinity's name were insurance and that Trinity did not qualify as an HCSM. Trinity ultimately agreed with that state's Commissioner to cease doing business there and paid a $150,000 fine.

59.    Other states, including California, Colorado, Connecticut, Iowa, Michigan, New York, New Hampshire, New Jersey, New Mexico, Oregon, Pennsylvania, and the District of Columbia also brought regulatory actions against Trinity, charging generally that the Trinity products Aliera sold were illegal

insurance and that the products were not exempt from regulation because Trinity was not a legitimate HCSM, and citing the egregious payment schedule and Aliera control set forth in the Management Agreement.

60.    Trinity also became the subject of several class action lawsuits, alleging that it was unfairly and deceptively selling illegal insurance and was not a qualified HCSM.

61.    As a result of Defendants' malpractice and aiding and abetting Aliera's scheme, Trinity was forced to incur millions of dollars in legal fees and pay fines in defending these regulatory actions and lawsuits.

62.    As a result of Defendants' malpractice and abetting Aliera's scheme, Trinity was placed in such a precarious legal and financial situation that it could never recover.

63.    By the end of 2019, Trinity members had paid over $200,000,000 to Aliera to participate in the Trinity healthcare plans. Aliera, with full control of the Trinity member money and the payment of claims, failed to pay claims as represented. By the end of 2019, there was a backlog of over $20 million in Trinity member claims that had been fully adjudicated and approved, but after Aliera directed the cash to its own expenses, commissions, and payments to the Moses family, it had no funds to pay the claims.

64.    The backlog continued to grow. By 2021, the Trinity (by this time called Sharity) backlog was over $50 million. Trinity sought to restructure through bankruptcy and emerge as an entity fully compliant with laws. That turned out to be impossible, and liquidation was the only viable option.

**J.    Burr Incorporated Trinity Under a Name That Infringed on the Name of Another Entity**

65.    Burr incorporated Trinity as "Trinity Healthshare, Inc.," but the name "Trinity Health" was already a registered tradename and mark.

66.    Months after Burr formed Trinity, Burr applied ***on behalf of Aliera***, with the U.S. Patent and Trademark Office to protect Trinity's name and mark, without notifying Trinity. Its application claimed ***Aliera*** was the owner of Trinity's marks.

67.    The USPTO objected to Aliera's application because Trinity's logo and name were confusingly similar to the registered marks of "Trinity Health," an unrelated entity. But Burr failed to notify or consult with Trinity about its failed application until Burr received a letter from Trinity Health, demanding that Aliera cease using the Trinity name and logo. With Burr's assistance, Aliera foisted all responsibility for the bungled trademark application and the cease-and-desist letter onto Trinity.

68.    As a result of Burr's negligence in incorporating "Trinity Healthshare" when the name "Trinity Health" was already registered, Trinity had to spend thousands of dollars in legal expenses to protect its name, marks, and brand. When those efforts proved unsuccessful, it had no choice but to rebrand as "Sharity."

## COUNT I
## NEGLIGENCE (LEGAL MALPRACTICE)
### (Sharity Trustee)

69.    Plaintiffs reallege paragraphs 1 through 68 above.

70.    This claim is asserted by the Sharity Trustee as assignee of the claims of Trinity (Sharity Ministries, Inc.)

71.    Trinity engaged Defendants as legal counsel to incorporate and apply for a tax-exemption for Trinity.

72.    Trinity had an attorney-client relationship with Defendants.

73.    In performing services for Trinity, Defendants owed Trinity duties of care and loyalty, including the competence and diligence normally exercised by lawyers in similar circumstances. In performing services as counsel for Trinity, Defendants breached those duties, in the manner set forth above.

74.    As a direct and proximate result of Defendants' breaches of their duties of care and loyalty, they caused damage to Trinity in an amount to be proved at trial.

## COUNT II
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES

## OWED TO TRINITY
### (Sharity Trustee)

75.     Plaintiffs reallege paragraphs 1 through 74 above.

76.     This claim is asserted by the Sharity Trustee as assignee of the claims of Trinity (Sharity Ministries, Inc.).

77.     Aliera was entrusted with Trinity's funds that were paid monthly as "contributions" (analogous to premium payments) directly to Aliera. Aliera was also entrusted by Trinity with control over its operations. As a result, Aliera had a fiduciary relationship with and owed fiduciary duties to Trinity.

78.     Aliera breached its fiduciaries duties to Trinity by:

(a)     Imposing an excessive fee and compensation structure in the Management Agreement that left inadequate amounts to pay medical expenses Trinity owed and subjected Trinity to regulatory and legal actions; and

(b)     Diverting funds that should have been used to pay Trinity members' medical expenses to pay its own debts and to enrich the Moses family.

79.     Defendants knowingly aided in Aliera's breach of fiduciary duty by:

(a)     Imposing the Management Agreement with knowledge that it left insufficient funds to pay claims; and

(b)     Creating the various Moses entities, knowing they would be used to divert the cash collected from members.

80.     Defendants took the actions above with the intent of benefiting Aliera and/or the Moses family at the expense of their client Trinity and its members.

81.     As a direct and proximate result of Defendants' knowing and substantial assistance to Aliera, in breach of fiduciary duties Aliera owed to Trinity, Defendants caused damages in an amount to be proven at trial.

## COUNT III
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES
## OWED TO ALIERA
### (Aliera Trustee)

82.     Plaintiffs reallege paragraphs 1 through 81 above.

83.     This claim is asserted by the Aliera Trustee as assignee of the claims of The Aliera Companies, Inc.

84.     The Insiders, as officers and directors of Aliera, owed Aliera a fiduciary duty of loyalty.

85.     The Insiders breached that fiduciary duty by causing Aliera to transfer funds paid into Aliera accounts to themselves personally or to the accounts of businesses which they owed, and for their own benefit. Those funds should have been set aside for payment of Aliera obligations, including the payment of members' medical claims.

86.     Defendants aided in the Insiders' breaches of fiduciary duty by creating the various Moses entities, knowing they would be used by the Insiders to siphon off

significant funds that Aliera collected from members. Defendants created these entities knowing that they would be used to benefit the Insiders at the expense of Aliera and its creditors.

87.     As a direct and proximate result of Defendants' knowing and substantial assistance to the Insiders, in breach of fiduciary duties they owed Aliera, Defendants caused damage to the Aliera in an amount to be proven at trial.

**COUNT IV**
**CONTRIBUTION**
**(Both Trustees)**

88.     Plaintiffs reallege paragraphs 1 through 87 above.

89.     Under both plans approved by the bankruptcy court, Sharity's members are allowed a claim against the Sharity Estate, and the Sharity Trustee is allowed a claim against the Aliera Estate on behalf of the members, for, at a minimum, the amount of their monthly "contributions" and enrollment fees. That amount totals $362,764,161 and is a fixed liability.

90.     The claims arise out of Defendants' malpractice and aiding and abetting Aliera's breaches of fiduciary duty, and aiding and abetting the Insiders' breaches of fiduciary duty.

91.     Plaintiffs, assert a right of contribution from Defendants under Georgia Code §§ 23-2-71 and 51-12-32.

## COUNT V
## ATTORNEY FEES AND COSTS
### (Both Trustees)

92.     Plaintiffs reallege paragraphs 1 through 91 above.

93.     Defendants have acted in bad faith, been stubbornly litigious, and caused Plaintiffs unnecessary trouble and expense.  Plaintiffs are entitled to an award of damages, including reasonable attorney fees and expenses incurred in bringing this action, pursuant to O.C.G.A § 13-6-11.

## V.     PRAYER FOR RELIEF

WHEREFORE, the Liquidating Trustees pray for judgment against Defendants, as follows:

     (a)     Awarding Plaintiffs damages in an amount to be proven at trial;

     (b)     Awarding Plaintiffs contribution in an amount to be proven at trial;

     (c)     Awarding punitive damages;

     (d)     Attorney fees, costs and expenses;

     (e)     All other relief the Court finds appropriate under the circumstances; and

(f)    PLAINTIFFS HEREBY DEMAND A TRIAL BY JURY ON

ALL ISSUES, AND CLAIMS PLED IN THIS LAWSUIT AND

ANY AMENDMENTS THERETO.

Dated:  July 15, 2024.

RESPECTFULLY SUBMITTED,

**COUNSEL FOR PLAINTIFFS**
**NEIL F. LURIA, IN HIS CAPACITY AS**
**LIQUIDATING TRUSTEE OF THE**
**SHARITY MINISTRIES, INC.**
**LIQUIDATING TRUST, and**
**ALIERA LT, LLC, AS LIQUIDATING TRUSTEE**
**FOR THE ALIERA COMPANIES, INC.**
**LIQUIDATING TRUST:**

By:    */s/ Terry D. Jackson*
TERRY D. JACKSON
Georgia Bar No. 386033



*"We Know Trucks"*
www.terryjacksonlaw.com

TERRY D. JACKSON, P.C.
600 Edgewood Avenue
Atlanta, Georgia 30312
(404) 216-5312 cell
(404) 659-2400 office
(404) 659-2414 fax
terry@terryjacksonlaw.com

Richard E. Spoonemore*
Eleanor Hamburger*
SIRIANNI YOUTZ SPOONEMORE
HAMBURGER PLLC
3101 Western Avenue, Suite 350
Seattle, WA 98121
Tel:  (206) 223-0303
Fax:  (206) 223-0246
rspoonemore@sylaw.com
ehamburger@sylaw.com

Joshua Karsh*
MEHRI &SKALET, PLLC
2000 K Street NW, Suite 235
Washington, DC 20006
Tel:  (202) 822-5100
Fax:  (202) 822-4997
JKarsh@findjustice.com

*Counsel for Plaintiffs*

*\*Pro hac vice applications forthcoming*

**Exhibit 1**

**BURR • • • FORMAN** LLP

*results matter*

Jennifer Mercier Moseley
jmoseley@burr.com
Direct Dial: (404) 685-4322
Direct Fax: (205) 244-5689

171 Seventeenth Street, NW
SUITE 1100
Atlanta, GA 30363

*Office* (404) 815-3000
*Fax* (404) 817-3244
*Toll-free* (877) FOR-BURR

BURR.COM

July 3, 2018

**VIA CERTIFIED MAIL (9314869904300048234607)**
**RETURN RECEIPT REQUESTED**

Internal Revenue Service
Attn: EO Determination Letters
Stop 31
Post Office Box 12192
Covington, Kentucky 41012-0192

**Re: Trinity Healthshare, Inc.**
**EIN 83-1050344**

Ladies and Gentlemen:

Enclosed is an Application for Recognition of Exemption under Section 501(c)(3) of the Internal Revenue Code for Trinity Healthshare, Inc. The user fee for this application, in the form of a check made payable to the United States Treasury in the amount of $600, is enclosed in the attached envelope. Pursuant to the Form 1023 Checklist, the following documents are enclosed:

1. Form 1023 Checklist;

2. Form 8718, User Fee for Exempt Organization Determination Letter Request;

3. Form 2848, Power of Attorney and Declaration of Representative;

4. Form 1023, Application for Recognition of Exemption;

   a. Additional information;

   b. Conflict of Interest Policy;

5. Certificate of Incorporation;

6. Bylaws;

7. Conflict of Interest Policy; and

8. EIN Confirmation.

Pursuant to Form 2848, please direct any questions or inquiries regarding the aforementioned documents to my attention by phone (404-685-4322), fax (205-244-5689) or email (jmoseley@burr.com).

Thank you for your assistance in this matter.

31930471 v1     A L A B A M A  •  F L O R I D A  •  G E O R G I A  •  M I S S I S S I P P I  •  T E N N E S S E E

Internal Revenue Service
July 3, 2018
Page 2

Sincerely,

Jennifer Mercier Moseley

CLH/pjk
Enclosures
cc:      Chelsea Beard (via Email cbeard@alierahealthcare.com)
         C. Logan Hinkle (via Email lhinkle@burr.com)

31930471 v1

**BU**

Vendo

Invoi
0702

**BURR ● ● ● FORMAN** LLP

171 Seventeenth Street, NW, Suite 1100
Atlanta, Georgia 30363

Trinity Healthshare, Inc.
EIN 83-1050344

---

THE ORIGINAL DOCUMENT HAS A WHITE REFLECTIVE WATERMARK ON THE BACK.          HOLD AT AN ANGLE TO VIEW. DO NOT CASH IF NOT PRESENT.

**BURR & FORMAN LLP**
420 N 20th Street
Suite 3400
Birmingham, AL 35203

WELLS FARGO - Atlanta Sub Operating

Check No.  **16861**

Date:          07/02/2018
Void After 180 days

Pay:    ***Six hundred and 00/100 ***

$*******600.00***

Pay
To The
Order Of     United States Treasury

⑈000⫶16861⫶⑈    ⑈06⫶2000080⫶⑈    2000047437948⑈

# 1

# Form 1023 Checklist

# Form 1023 Checklist
## (Revised December 2017)

**Application for Recognition of Exemption under Section 501(c)(3) of the
Internal Revenue Code**

**Note:** Retain a copy of the completed Form 1023 in your permanent records. Refer to the General Instructions regarding Public Inspection of approved applications.

**Check each box to finish your application (Form 1023). Send this completed Checklist with your filled-in application. If you have not answered all the items below, your application may be returned to you as incomplete.**

☑ Assemble the application and materials in this order.
- Form 1023 Checklist
- Form 2848, *Power of Attorney and Declaration of Representative* (if filing)
- Form 8821, *Tax Information Authorization* (if filing)
- Expedite request (if requesting)
- Application (Form 1023 and Schedules A through H, as required)
- Articles of organization
- Amendments to articles of organization in chronological order
- Bylaws or other rules of operation and amendments
- Documentation of nondiscriminatory policy for schools, as required by Schedule B
- Form 5768, Election/Revocation of Election by an Eligible Section 501(c)(3) Organization To Make Expenditures To Influence Legislation (if filing)
- All other attachments, including explanations, financial data, and printed materials or publications. Label each page with name and EIN.

☑ User fee payment placed in envelope on top of checklist. DO NOT STAPLE or otherwise attach your check or money order to your application. Instead, just place it in the envelope.

☑ Employer Identification Number (EIN)

☑ Completed Parts I through XI of the application, including any requested information and any required Schedules A through H.
- You must provide specific details about your past, present, and planned activities.
- Generalizations or failure to answer questions in the Form 1023 application will prevent us from recognizing you as tax exempt.
- Describe your purposes and proposed activities in specific easily understood terms.
- Financial information should correspond with proposed activities.

☑ Schedules. Submit only those schedules that apply to you and check either "Yes" or "No" below.

| | | | | | |
|---|---|---|---|---|---|
| Schedule A | Yes ___ | No ✓ | Schedule E | Yes ___ | No ✓ |
| Schedule B | Yes ___ | No ✓ | Schedule F | Yes ___ | No ✓ |
| Schedule C | Yes ___ | No ✓ | Schedule G | Yes ___ | No ✓ |
| Schedule D | Yes ___ | No ✓ | Schedule H | Yes ___ | No ✓ |

☑ An exact copy of your complete articles of organization (creating document). Absence of the proper purpose and dissolution clauses is the number one reason for delays in the issuance of determination letters.
  • Location of Purpose Clause from Part III, line 1 (Page, Article and Paragraph Number) **Page 2, third section**
  • Location of Dissolution Clause from Part III, line 2b or 2c (Page, Article and Paragraph Number) or by operation of state law **Page 2, sixth section**

☑ Signature of an officer, director, trustee, or other official who is authorized to sign the application.
  • Signature at Part XI of Form 1023.

☑ Your name on the application must be the same as your legal name as it appears in your articles of organization.

Send completed Form 1023, user fee payment, and all other required information, to:

Internal Revenue Service
Attention: EO Determination Letters
Stop 31
P.O. Box 12192
Covington, KY 41012-0192

If you are using express mail or a delivery service, send Form 1023, user fee payment, and attachments to:

Internal Revenue Service
Attention: EO Determination Letters
Stop 31
201 West Rivercenter Boulevard
Covington, KY 41011

2

Form 8718

# Form 8718

(Rev. March 2018)

Department of the Treasury
Internal Revenue Service

## User Fee for Exempt Organization Determination Letter Request

▶ **Attach this form to determination letter application.**
**(Form 8718 is NOT a determination letter application.)**
▶ **Go to www.irs.gov/Form8718 for the latest information.**

OMB No. 1545-1798

For IRS Use Only

Control number _____
Amount paid _____
User fee screener _____

| Name of organization | Employer Identification Number |
|---|---|
| Trinity Healthshare, Inc. | 83-1050344 |

**Caution:** Do not attach Form 8718 to an application for a pension plan determination letter. Use Form 8717 instead.

**1  Type of request**                                                                                      **Fee**

**a** ☑  Application for recognition of exemption under section 501 or under section 521 from organizations (other than pension, profit-sharing, and stock bonus plans described in section 401). Enter the applicable fee amount . . . . . . . . . . . . . . ▶ $ _____ 600

**b** ☐  Group exemption letters . . . . . . . . . . . . . . . . ▶ $ _____

Section references are to the Internal Revenue Code, unless otherwise noted.

## Instructions

The law requires payment of a user fee with each application for a determination letter. For more information, see Rev. Proc. 2018-5, 2018-1 I.R.B. 233, or latest annual update, available on IRS.gov.

Check only one box on line 1 for the type of application you are submitting. Then, enter the appropriate user fee amount in the space provided.

**Caution:** The application will not be processed without payment of the proper user fee.

Attach to Form 8718 a check or money order payable to the "United States Treasury" for the full amount of the user fee. If you do not include the full amount, your application will be returned. Attach Form 8718 to your determination letter application.

Generally, the user fee will be refunded only if the Internal Revenue Service declines to issue a determination.

## Where To File

Send the determination letter application and Form 8718 to:

Internal Revenue Service
P.O. Box 12192
Covington, KY 41012-0192

## Who Should File

Organizations applying for federal income tax exemption, other than filers of Form 1023, Application for Recognition of Exemption Under Section 501(c)(3), or Form 1023-EZ (filed only electronically), should file Form 8718.

**Paperwork Reduction Act Notice.** We ask for the information on this form to carry out the Internal Revenue laws of the United States. If you want your organization to be recognized as tax-exempt by the IRS, you are required to give us this information. We need it to determine whether the organization meets the legal requirements for tax-exempt status.

You are not required to provide the information requested on a form that is subject to the Paperwork Reduction Act unless the form displays a valid OMB control number. Books or records relating to a form or its instructions must be retained as long as their contents may become material in the administration of any Internal Revenue law. The rules governing the confidentiality of Form 8718 are covered in section 6104.

The time needed to complete and file this form will vary depending on individual circumstances. The estimated average time is 5 minutes. If you have suggestions for making this form simpler, we would be happy to hear from you. You can send us comments from *IRS.gov/FormComments*. Or you can send your comments to the Internal Revenue Service, Tax Forms and Publications, 1111 Constitution Ave. NW, IR-6526, Washington, DC 20224. Do not send the form to this address. Instead, see *Where To File*, above.

Cat. No. 64728Z                                                                     Form **8718** (Rev. 3-2018)



3

Form 2848

Form **2848**
(Rev. January 2018)
Department of the Treasury
Internal Revenue Service

## Power of Attorney and Declaration of Representative

▶ Go to *www.irs.gov/Form2848* for Instructions and the latest information.

OMB No. 1545-0150

| For IRS Use Only |
|---|
| Received by: |
| Name _____ |
| Telephone _____ |
| Function _____ |
| Date ___/___/___ |

**Part I**    **Power of Attorney**

**Caution:** A separate Form 2848 must be completed for each taxpayer. Form 2848 will not be honored for any purpose other than representation before the IRS.

**1   Taxpayer information.** Taxpayer must sign and date this form on page 2, line 7.

| Taxpayer name and address | Taxpayer identification number(s) |
|---|---|
| Trinity Healthshare, Inc.<br>860 Johnson Ferry Rd, STE 140-106<br>Atlanta, GA 30342 | 83-1050344 |

| Daytime telephone number | Plan number (if applicable) |
|---|---|
| 404-401-1748 | |

hereby appoints the following representative(s) as attorney(s)-in-fact:

**2   Representative(s)** must sign and date this form on page 2, Part II.

| Name and address | |
|---|---|
| Jennifer Moseley<br>171 17th Street NW, Suite 1100<br>Atlanta, GA 30363<br>**Check if to be sent copies of notices and communications** ☑ | CAF No.   None<br>PTIN _____<br>Telephone No.   404-685-4322<br>Fax No.   205-244-5689<br>Check if new: Address ☐   Telephone No. ☐   Fax No. ☐ |

| Name and address | |
|---|---|
| Logan Hinkle<br>171 17th Street NW, Suite 1100<br>Atlanta, GA 30363<br>**Check if to be sent copies of notices and communications** ☑ | CAF No.   0100-25939R<br>PTIN _____<br>Telephone No.   205-458-5154<br>Fax No.   205-244-5659<br>Check if new: Address ☐   Telephone No. ☐   Fax No. ☐ |

| Name and address | |
|---|---|
| <br>(Note: IRS sends notices and communications to only two representatives.) | CAF No. _____<br>PTIN _____<br>Telephone No. _____<br>Fax No. _____<br>Check if new: Address ☐   Telephone No. ☐   Fax No. ☐ |

| Name and address | |
|---|---|
| <br>(Note: IRS sends notices and communications to only two representatives.) | CAF No. _____<br>PTIN _____<br>Telephone No. _____<br>Fax No. _____<br>Check if new: Address ☐   Telephone No. ☐   Fax No. ☐ |

to represent the taxpayer before the Internal Revenue Service and perform the following acts:

**3   Acts authorized (you are required to complete this line 3).** With the exception of the acts described in line 5b, I authorize my representative(s) to receive and inspect my confidential tax information and to perform acts that I can perform with respect to the tax matters described below. For example, my representative(s) shall have the authority to sign any agreements, consents, or similar documents (see instructions for line 5a for authorizing a representative to sign a return).

| Description of Matter (Income, Employment, Payroll, Excise, Estate, Gift, Whistleblower, Practitioner Discipline, PLR, FOIA, Civil Penalty, Sec. 5000A Shared Responsibility Payment, Sec. 4980H Shared Responsibility Payment, etc.) (see instructions) | Tax Form Number (1040, 941, 720, etc.) (if applicable) | Year(s) or Period(s) (if applicable) (see instructions) |
|---|---|---|
| Application for Recognition of Exemption | 1023 | NA |
| | | |
| | | |

**4   Specific use not recorded on Centralized Authorization File (CAF).** If the power of attorney is for a specific use not recorded on CAF, check this box. See the instructions for Line 4. Specific Use Not Recorded on CAF  . . . . . . . . . . . . .  ▶ ☑

**5a   Additional acts authorized.** In addition to the acts listed on line 3 above, I authorize my representative(s) to perform the following acts (see instructions for line 5a for more information): ☐ Access my IRS records via an Intermediate Service Provider;
☐ Authorize disclosure to third parties;   ☐ Substitute or add representative(s);   ☐ Sign a return; _____

☐ Other acts authorized: _____

For Privacy Act and Paperwork Reduction Act Notice, see the instructions.      Cat. No. 11980J      Form **2848** (Rev. 1-2018)

Form 2848 (Rev. 1-2018) 

Page **2**

   **b** **Specific acts not authorized.** My representative(s) is (are) not authorized to endorse or otherwise negotiate any check (including directing or accepting payment by any means, electronic or otherwise, into an account owned or controlled by the representative(s) or any firm or other entity with whom the representative(s) is (are) associated) issued by the government in respect of a federal tax liability.
List any other specific deletions to the acts otherwise authorized in this power of attorney (see instructions for line 5b): ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

**6** **Retention/revocation of prior power(s) of attorney.** The filing of this power of attorney automatically revokes all earlier power(s) of attorney on file with the Internal Revenue Service for the same matters and years or periods covered by this document. If you **do not** want to revoke a prior power of attorney, check here . . . . . . . . . . . . . . . . ▶ ☐
**YOU MUST ATTACH A COPY OF ANY POWER OF ATTORNEY YOU WANT TO REMAIN IN EFFECT.**

**7** **Signature of taxpayer.** If a tax matter concerns a year in which a joint return was filed, each spouse must file a separate power of attorney even if they are appointing the same representative(s). If signed by a corporate officer, partner, guardian, tax matters partner, partnership representative, executor, receiver, administrator, or trustee on behalf of the taxpayer, I certify that I have the legal authority to execute this form on behalf of the taxpayer.

   ▶ **IF NOT COMPLETED, SIGNED, AND DATED, THE IRS WILL RETURN THIS POWER OF ATTORNEY TO THE TAXPAYER.**

| | | |
|---|---|---|
| *(signature)* | 6-28-18 | *Chairman* |
| Signature | Date | Title (if applicable) |

| | |
|---|---|
| Print Name | Print name of taxpayer from line 1 if other than individual |

| **Part II** | **Declaration of Representative** |
|---|---|

Under penalties of perjury, by my signature below I declare that:
- I am not currently suspended or disbarred from practice, or ineligible for practice, before the Internal Revenue Service;
- I am subject to regulations contained in Circular 230 (31 CFR, Subtitle A, Part 10), as amended, governing practice before the Internal Revenue Service;
- I am authorized to represent the taxpayer identified in Part I for the matter(s) specified there; and
- I am one of the following:

   **a** Attorney—a member in good standing of the bar of the highest court of the jurisdiction shown below.

   **b** Certified Public Accountant—a holder of an active license to practice as a certified public accountant in the jurisdiction shown below.

   **c** Enrolled Agent—enrolled as an agent by the Internal Revenue Service per the requirements of Circular 230.

   **d** Officer—a bona fide officer of the taxpayer organization.

   **e** Full-Time Employee—a full-time employee of the taxpayer.

   **f** Family Member—a member of the taxpayer's immediate family (spouse, parent, child, grandparent, grandchild, step-parent, step-child, brother, or sister).

   **g** Enrolled Actuary—enrolled as an actuary by the Joint Board for the Enrollment of Actuaries under 29 U.S.C. 1242 (the authority to practice before the Internal Revenue Service is limited by section 10.3(d) of Circular 230).

   **h** Unenrolled Return Preparer—Authority to practice before the IRS is limited. An unenrolled return preparer may represent, provided the preparer (1) prepared and signed the return or claim for refund (or prepared if there is no signature space on the form); (2) was eligible to sign the return or claim for refund; (3) has a valid PTIN; and (4) possesses the required Annual Filing Season Program Record of Completion(s). ***See Special Rules and Requirements for Unenrolled Return Preparers in the instructions for additional information.***

   **k** Qualifying Student—receives permission to represent taxpayers before the IRS by virtue of his/her status as a law, business, or accounting student working in an LITC or STCP. See instructions for Part II for additional information and requirements.

   **r** Enrolled Retirement Plan Agent—enrolled as a retirement plan agent under the requirements of Circular 230 (the authority to practice before the Internal Revenue Service is limited by section 10.3(e)).

   ▶ **IF THIS DECLARATION OF REPRESENTATIVE IS NOT COMPLETED, SIGNED, AND DATED, THE IRS WILL RETURN THE POWER OF ATTORNEY. REPRESENTATIVES MUST SIGN IN THE ORDER LISTED IN PART I, LINE 2.**

**Note:** For designations d-f, enter your title, position, or relationship to the taxpayer in the "Licensing jurisdiction" column.

| Designation— Insert above letter (a–r). | Licensing jurisdiction (State) or other licensing authority (if applicable). | Bar, license, certification, registration, or enrollment number (if applicable). | Signature | Date |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Form **2848** (Rev. 1-2018)

Form 2848 (Rev. 1-2018) Page **2**

**b** **Specific acts not authorized.** My representative(s) is (are) not authorized to endorse or otherwise negotiate any check (including directing or accepting payment by any means, electronic or otherwise, into an account owned or controlled by the representative(s) or any firm or other entity with whom the representative(s) is (are) associated) issued by the government in respect of a federal tax liability.

List any other specific deletions to the acts otherwise authorized in this power of attorney (see instructions for line 5b): ----------------

**6** **Retention/revocation of prior power(s) of attorney.** The filing of this power of attorney automatically revokes all earlier power(s) of attorney on file with the Internal Revenue Service for the same matters and years or periods covered by this document. If you do not want to revoke a prior power of attorney, check here  .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   ▶ ☐
   **YOU MUST ATTACH A COPY OF ANY POWER OF ATTORNEY YOU WANT TO REMAIN IN EFFECT.**

**7** **Signature of taxpayer.** If a tax matter concerns a year in which a joint return was filed, each spouse must file a separate power of attorney even if they are appointing the same representative(s). If signed by a corporate officer, partner, guardian, tax matters partner, partnership representative, executor, receiver, administrator, or trustee on behalf of the taxpayer, I certify that I have the legal authority to execute this form on behalf of the taxpayer.

▶ **IF NOT COMPLETED, SIGNED, AND DATED, THE IRS WILL RETURN THIS POWER OF ATTORNEY TO THE TAXPAYER.**

| | | |
|---|---|---|
| *William H. Thead III* | 6-28-18 | *Chairman* |
| Signature | Date | Title (if applicable) |
| *William H. Thead III* | *Trinity Healthshare, Inc.* | |
| Print Name | Print name of taxpayer from line 1 if other than individual | |

**Part II    Declaration of Representative**

Under penalties of perjury, by my signature below I declare that:

• I am not currently suspended or disbarred from practice, or ineligible for practice, before the Internal Revenue Service;
• I am subject to regulations contained in Circular 230 (31 CFR, Subtitle A, Part 10), as amended, governing practice before the Internal Revenue Service;
• I am authorized to represent the taxpayer identified in Part I for the matter(s) specified there; and
• I am one of the following:

 **a** Attorney—a member in good standing of the bar of the highest court of the jurisdiction shown below.
 **b** Certified Public Accountant—a holder of an active license to practice as a certified public accountant in the jurisdiction shown below.
 **c** Enrolled Agent—enrolled as an agent by the Internal Revenue Service per the requirements of Circular 230.
 **d** Officer—a bona fide officer of the taxpayer organization.
 **e** Full-Time Employee—a full-time employee of the taxpayer.
 **f** Family Member—a member of the taxpayer's immediate family (spouse, parent, child, grandparent, grandchild, step-parent, step-child, brother, or sister).
 **g** Enrolled Actuary—enrolled as an actuary by the Joint Board for the Enrollment of Actuaries under 29 U.S.C. 1242 (the authority to practice before the Internal Revenue Service is limited by section 10.3(d) of Circular 230).
 **h** Unenrolled Return Preparer—Authority to practice before the IRS is limited. An unenrolled return preparer may represent, provided the preparer (1) prepared and signed the return or claim for refund (or prepared if there is no signature space on the form); (2) was eligible to sign the return or claim for refund; (3) has a valid PTIN; and (4) possesses the required Annual Filing Season Program Record of Completion(s). *See Special Rules and Requirements for Unenrolled Return Preparers in the instructions for additional information.*
 **k** Qualifying Student—receives permission to represent taxpayers before the IRS by virtue of his/her status as a law, business, or accounting student working in an LITC or STCP. See instructions for Part II for additional information and requirements.
 **r** Enrolled Retirement Plan Agent—enrolled as a retirement plan agent under the requirements of Circular 230 (the authority to practice before the Internal Revenue Service is limited by section 10.3(e)).

▶ **IF THIS DECLARATION OF REPRESENTATIVE IS NOT COMPLETED, SIGNED, AND DATED, THE IRS WILL RETURN THE POWER OF ATTORNEY. REPRESENTATIVES MUST SIGN IN THE ORDER LISTED IN PART I, LINE 2.**

**Note:** For designations d–f, enter your title, position, or relationship to the taxpayer in the "Licensing jurisdiction" column.

| Designation— Insert above letter (a–r). | Licensing jurisdiction (State) or other licensing authority (if applicable). | Bar, license, certification, registration, or enrollment number (if applicable). | Signature | Date |
|---|---|---|---|---|
| A | GA | 367065 | *(signature)* | 7/3/18 |
| A | AL | ASB-5602-L73C | *(signature)* | 07/02/218 |
| | | | | |
| | | | | |
| | | | | |

Form **2848** (Rev. 1-2018)

4

# Form 1023 w/ Attachments

Form **1023**

(Rev. December 2017)
Department of the Treasury
Internal Revenue Service

## Application for Recognition of Exemption
### Under Section 501(c)(3) of the Internal Revenue Code
► Do not enter social security numbers on this form as it may be made public.
► Go to *www.irs.gov/Form1023* for instructions and the latest information.

OMB No. 1545-0056
Note: If exempt status is approved, this application will be open for public inspection.

*Use the instructions to complete this application and for a definition of all bold items.* For additional help, call IRS Exempt Organizations Customer Account Services toll-free at 1-877-829-5500. Visit our website at *www.irs.gov* for forms and publications. If the required information and documents are not submitted with payment of the appropriate user fee, the application may be returned to you.

Attach additional sheets to this application if you need more space to answer fully. Put your name and EIN on each sheet and identify each answer by Part and line number. Complete Parts I – XI of Form 1023 and submit only those Schedules (A through H) that apply to you.

### Part I:  Identification of Applicant

| | | |
|---|---|---|
| 1  Full name of organization (exactly as it appears in your **organizing document**) <br><br> Trinity Healthshare, Inc. | 2  c/o Name (if applicable) | |

| | | | |
|---|---|---|---|
| 3  Mailing address (Number and street) (see instructions) <br><br> 860 Johnson Ferry Road | Room/Suite <br><br> 140-106 | 4  Employer Identification Number (EIN) <br><br> 83-1050344 | |
| City or town, state or country, and ZIP + 4 <br><br> Atlanta, GA 30342 | | 5  Month the annual accounting period ends (01 – 12) <br><br> December | |

| | | |
|---|---|---|
| 6  Primary contact (officer, director, trustee, or **authorized representative**) <br> a Name: <br><br> Jennifer Moseley | b  Phone:   404-401-1748 <br> c  Fax: (optional) | |

| | |
|---|---|
| 7  Are you represented by an authorized representative, such as an attorney or accountant? If "Yes," provide the authorized representative's name, and the name and address of the authorized representative's firm. Include a completed Form 2848, *Power of Attorney and Declaration of Representative*, with your application if you would like us to communicate with your representative. | ☑ Yes   ☐ No |
| 8  Was a person who is not one of your officers, directors, trustees, employees, or an authorized representative listed in line 7, paid, or promised payment, to help plan, manage, or advise you about the structure or activities of your organization, or about your financial or tax matters? If "Yes," provide the person's name, the name and address of the person's firm, the amounts paid or promised to be paid, and describe that person's role. | ☐ Yes   ☑ No |
| 9 a  Organization's website:  none at this time <br><br> b  Organization's email: (optional) | |
| 10  Certain organizations are not required to file an information return (Form 990 or Form 990-EZ). If you are granted tax-exemption, are you claiming to be excused from filing Form 990 or Form 990-EZ? If "Yes," explain. See the instructions for a description of organizations not required to file Form 990 or Form 990-EZ. | ☐ Yes   ☑ No |
| 11  Date incorporated if a corporation, or formed, if other than a corporation.   (MM/DD/YYYY)   06 / 26 / 2018 | |
| 12  Were you formed under the laws of a **foreign country**? <br> If "Yes," state the country. | ☐ Yes   ☑ No |

For Paperwork Reduction Act Notice, see instructions.          Cat. No. 17133K          Form **1023** (Rev. 12-2017)

Form 1023 (Rev. 12-2017)    Name: Trinity Healthshare, Inc.    EIN: 83-1050344    Page **2**

## Part II    Organizational Structure

You must be a corporation (including a limited liability company), an unincorporated association, or a trust to be tax exempt.
See instructions. **DO NOT file this form unless you can check "Yes" on lines 1, 2, 3, or 4.**

| | | | |
|---|---|---|---|
| 1 | Are you a **corporation**? If "Yes," attach a copy of your articles of incorporation showing **certification of filing** with the appropriate state agency. Include copies of any amendments to your articles and be sure they also show state filing certification. | ☑ Yes | ☐ No |
| 2 | Are you a **limited liability company (LLC)**? If "Yes," attach a copy of your articles of organization showing certification of filing with the appropriate state agency. Also, if you adopted an operating agreement, attach a copy. Include copies of any amendments to your articles and be sure they show state filing certification. Refer to the instructions for circumstances when an LLC should not file its own exemption application. | ☐ Yes | ☑ No |
| 3 | Are you an **unincorporated association**? If "Yes," attach a copy of your articles of association, constitution, or other similar organizing document that is dated and includes at least two signatures. Include signed and dated copies of any amendments. | ☐ Yes | ☑ No |
| 4a | Are you a **trust**? If "Yes," attach a signed and dated copy of your trust agreement. Include signed and dated copies of any amendments. | ☐ Yes | ☑ No |
| b | Have you been funded? If "No," explain how you are formed without anything of value placed in trust. | ☐ Yes | ☐ No |
| 5 | Have you adopted **bylaws**? If "Yes," attach a current copy showing date of adoption. If "No," explain how your officers, directors, or trustees are selected. | ☑ Yes | ☐ No |

## Part III    Required Provisions in Your Organizing Document

The following questions are designed to ensure that when you file this application, your organizing document contains the required provisions to meet the organizational test under section 501(c)(3). Unless you can check the boxes in both lines 1 and 2, your organizing document does not meet the organizational test. **DO NOT file this application until you have amended your organizing document.** Submit your original and amended organizing documents (showing state filing certification if you are a corporation or an LLC) with your application.

| | | |
|---|---|---|
| 1 | Section 501(c)(3) requires that your organizing document state your exempt purpose(s), such as charitable, religious, educational, and/or scientific purposes. Check the box to confirm that your organizing document meets this requirement. Describe specifically where your organizing document meets this requirement, such as a reference to a particular article or section in your organizing document. Refer to the instructions for exempt purpose language. | ☑ |
| | Location of Purpose Clause (Page, Article, and Paragraph): <u>Within Art. of Incorporation, see attached. Page 2, Sect. 3.</u> | |
| 2a | Section 501(c)(3) requires that upon dissolution of your organization, your remaining assets must be used exclusively for exempt purposes, such as charitable, religious, educational, and/or scientific purposes. Check the box on line 2a to confirm that your organizing document meets this requirement by express provision for the distribution of assets upon dissolution. If you rely on state law for your dissolution provision, do not check the box on line 2a and go to line 2c. | ☑ |
| b | If you checked the box on line 2a, specify the location of your dissolution clause (Page, Article, and Paragraph). Do not complete line 2c if you checked box 2a. <u>Within Art. of Incorporation, see attached. Page 2, Sect. 6.</u> | |
| c | See the instructions for information about the operation of state law in your particular state. Check this box if you rely on operation of state law for your dissolution provision and indicate the state: | ☐ |

## Part IV    Narrative Description of Your Activities

Using an attachment, describe your *past, present,* and *planned* activities in a narrative. If you believe that you have already provided some of this information in response to other parts of this application, you may summarize that information here and refer to the specific parts of the application for supporting details. You may also attach representative copies of newsletters, brochures, or similar documents for supporting details to this narrative. Remember that if this application is approved, it will be open for public inspection. Therefore, your narrative description of activities should be thorough and accurate. Refer to the instructions for information that must be included in your description.

## Part V    Compensation and Other Financial Arrangements With Your Officers, Directors, Trustees, Employees, and Independent Contractors

1a  List the names, titles, and mailing addresses of all of your officers, directors, and trustees. For each person listed, state their total annual **compensation**, or proposed compensation, for all services to the organization, whether as an officer, employee, or other position. Use actual figures, if available. Enter "none" if no compensation is or will be paid. If additional space is needed, attach a separate sheet. Refer to the instructions for information on what to include as compensation.

| Name | Title | Mailing address | Compensation amount (annual actual or estimated) |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

Form **1023** (Rev. 12-2017)

Form 1023 (Rev. 12-2017)    Name: Trinity Healthshare, Inc.    EIN: 83-1050344    Page **3**

**Part V** | **Compensation and Other Financial Arrangements With Your Officers, Directors, Trustees, Employees, and Independent Contractors** *(Continued)*

**b** List the names, titles, and mailing addresses of each of your five highest compensated employees who receive or will receive compensation of more than $50,000 per year. Use the actual figure, if available. Refer to the instructions for information on what to include as compensation. Do not include officers, directors, or trustees listed in line 1a.

| Name | Title | Mailing address | Compensation amount (annual actual or estimated) |
|------|-------|-----------------|--------------------------------------------------|
|      |       |                 |                                                  |
|      |       |                 |                                                  |
|      |       |                 |                                                  |
|      |       |                 |                                                  |
|      |       |                 |                                                  |

**c** List the names, names of businesses, and mailing addresses of your five highest compensated independent contractors that receive or will receive compensation of more than $50,000 per year. Use the actual figure, if available. Refer to the instructions for information on what to include as compensation.

| Name | Title | Mailing address | Compensation amount (annual actual or estimated) |
|------|-------|-----------------|--------------------------------------------------|
|      |       |                 |                                                  |
|      |       |                 |                                                  |
|      |       |                 |                                                  |
|      |       |                 |                                                  |
|      |       |                 |                                                  |

The following "Yes" or "No" questions relate to *past, present,* or *planned* relationships, transactions, or agreements with your officers, directors, trustees, highest compensated employees, and highest compensated independent contractors listed in lines 1a, 1b, and 1c.

**2a** Are any of your officers, directors, or trustees **related** to each other through **family or business relationships?** If "Yes," identify the individuals and explain the relationship.  ☑ Yes  ☐ No

**b** Do you have a business relationship with any of your officers, directors, or trustees other than through their position as an officer, director, or trustee? If "Yes," identify the individuals and describe the business relationship with each of your officers, directors, or trustees.  ☐ Yes  ☑ No

**c** Are any of your officers, directors, or trustees related to your highest compensated employees or highest compensated independent contractors listed on lines 1b or 1c through family or business relationships? If "Yes," identify the individuals and explain the relationship.  ☐ Yes  ☑ No

**3a** For each of your officers, directors, trustees, highest compensated employees, and highest compensated independent contractors listed on lines 1a, 1b, or 1c, attach a list showing their name, qualifications, average hours worked, and duties.

**b** Do any of your officers, directors, trustees, highest compensated employees, and highest compensated independent contractors listed on lines 1a, 1b, or 1c receive compensation from any other organizations, whether tax exempt or taxable, that are related to you through **common control?** If "Yes," identify the individuals, explain the relationship between you and the other organization, and describe the compensation arrangement.  ☐ Yes  ☑ No

**4** In establishing the compensation for your officers, directors, trustees, highest compensated employees, and highest compensated independent contractors listed on lines 1a, 1b, or 1c, the following practices are recommended, although they are not required to obtain exemption. Answer "Yes" to all the practices you use.

**a** Do you or will the individuals that approve compensation arrangements follow a conflict of interest policy?  ☑ Yes  ☐ No

**b** Do you or will you approve compensation arrangements in advance of paying compensation?  ☑ Yes  ☐ No

**c** Do you or will you document in writing the date and terms of approved compensation arrangements?  ☑ Yes  ☐ No

Form 1023 (Rev. 12-2017)    Name: Trinity Healthshare, Inc.    EIN: 83-1050344    Page **4**

**Part V** Compensation and Other Financial Arrangements With Your Officers, Directors, Trustees, Employees, and Independent Contractors *(Continued)*

| | | | |
|---|---|---|---|
| **d** | Do you or will you record in writing the decision made by each individual who decided or voted on compensation arrangements? | ☑ Yes | ☐ No |
| **e** | Do you or will you approve compensation arrangements based on information about compensation paid by **similarly situated** taxable or tax-exempt organizations for similar services, current compensation surveys compiled by independent firms, or actual written offers from similarly situated organizations? Refer to the instructions for Part V, lines 1a, 1b, and 1c, for information on what to include as compensation. | ☑ Yes | ☐ No |
| **f** | Do you or will you record in writing both the information on which you relied to base your decision and its source? | ☑ Yes | ☐ No |
| **g** | If you answered "No" to any item on lines 4a through 4f, describe how you set compensation that is **reasonable** for your officers, directors, trustees, highest compensated employees, and highest compensated independent contractors listed in Part V, lines 1a, 1b, and 1c. | | |
| **5a** | Have you adopted a **conflict of interest policy** consistent with the sample conflict of interest policy in Appendix A to the instructions? If "Yes," provide a copy of the policy and explain how the policy has been adopted, such as by resolution of your governing board. If "No," answer lines 5b and 5c. | ☑ Yes | ☐ No |
| **b** | What procedures will you follow to assure that persons who have a conflict of interest will not have influence over you for setting their own compensation? | | |
| **c** | What procedures will you follow to assure that persons who have a conflict of interest will not have influence over you regarding business deals with themselves? **Note:** A conflict of interest policy is recommended though it is not required to obtain exemption. Hospitals, see Schedule C, Section I, line 14. | | |
| **6a** | Do you or will you compensate any of your officers, directors, trustees, highest compensated employees, and highest compensated independent contractors listed in lines 1a, 1b, or 1c through **non-fixed payments**, such as discretionary bonuses or revenue-based payments? If "Yes," describe all non-fixed compensation arrangements, including how the amounts are determined, who is eligible for such arrangements, whether you place a limitation on total compensation, and how you determine or will determine that you pay no more than reasonable compensation for services. Refer to the instructions for Part V, lines 1a, 1b, and 1c, for information on what to include as compensation. | ☐ Yes | ☑ No |
| **b** | Do you or will you compensate any of your employees, other than your officers, directors, trustees, or your five highest compensated employees who receive or will receive compensation of more than $60,000 per year, through non-fixed payments, such as discretionary bonuses or revenue-based payments? If "Yes," describe all non-fixed compensation arrangements, including how the amounts are or will be determined, who is or will be eligible for such arrangements, whether you place or will place a limitation on total compensation, and how you determine or will determine that you pay no more than reasonable compensation for services. Refer to the instructions for Part V, lines 1a, 1b, and 1c, for information on what to include as compensation. | ☐ Yes | ☑ No |
| **7a** | Do you or will you purchase any goods, services, or assets from any of your officers, directors, trustees, highest compensated employees, or highest compensated independent contractors listed in lines 1a, 1b, or 1c? If "Yes," describe any such purchase that you made or intend to make, from whom you make or will make such purchases, how the terms are or will be negotiated at **arm's length**, and explain how you determine or will determine that you pay no more than fair market value. Attach copies of any written contracts or other agreements relating to such purchases. | ☐ Yes | ☑ No |
| **b** | Do you or will you sell any goods, services, or assets to any of your officers, directors, trustees, highest compensated employees, or highest compensated independent contractors listed in lines 1a, 1b, or 1c? If "Yes," describe any such sales that you made or intend to make, to whom you make or will make such sales, how the terms are or will be negotiated at arm's length, and explain how you determine or will determine you are or will be paid at least fair market value. Attach copies of any written contracts or other agreements relating to such sales. | ☐ Yes | ☑ No |
| **8a** | Do you or will you have any leases, contracts, loans, or other agreements with your officers, directors, trustees, highest compensated employees, or highest compensated independent contractors listed in lines 1a, 1b, or 1c? If "Yes," provide the information requested in lines 8b through 8f. | ☐ Yes | ☑ No |
| **b** | Describe any written or oral arrangements that you made or intend to make. | | |
| **c** | Identify with whom you have or will have such arrangements. | | |
| **d** | Explain how the terms are or will be negotiated at arm's length. | | |
| **e** | Explain how you determine you pay no more than fair market value or you are paid at least fair market value. | | |
| **f** | Attach copies of any signed leases, contracts, loans, or other agreements relating to such arrangements. | | |
| **9a** | Do you or will you have any leases, contracts, loans, or other agreements with any organization in which any of your officers, directors, or trustees are also officers, directors, or trustees, or in which any individual officer, director, or trustee owns more than a 35% interest? If "Yes," provide the information requested in lines 9b through 9f. | ☐ Yes | ☑ No |

Form **1023** (Rev. 12-2017)

Form 1023 (Rev. 12-2017)    Name: Trinity Healthshare, Inc.    EIN: 83-1050344    Page **5**

**Part V** Compensation and Other Financial Arrangements With Your Officers, Directors, Trustees, Employees, and Independent Contractors *(Continued)*

b   Describe any written or oral arrangements you made or intend to make.

c   Identify with whom you have or will have such arrangements.

d   Explain how the terms are or will be negotiated at arm's length.

e   Explain how you determine or will determine you pay no more than fair market value or that you are paid at least fair market value.

f   Attach a copy of any signed leases, contracts, loans, or other agreements relating to such arrangements.

**Part VI** Your Members and Other Individuals and Organizations That Receive Benefits From You

The following "Yes" or "No" questions relate to goods, services, and funds you provide to individuals and organizations as part of your activities. Your answers should pertain to *past, present, and planned* activities. See instructions.

| | | | |
|---|---|---|---|
| 1a | In carrying out your exempt purposes, do you provide goods, services, or funds to individuals? If "Yes," describe each program that provides goods, services, or funds to individuals. | ☑ Yes | ☐ No |
| b | In carrying out your exempt purposes, do you provide goods, services, or funds to organizations? If "Yes," describe each program that provides goods, services, or funds to organizations. | ☐ Yes | ☑ No |
| 2 | Do any of your programs limit the provision of goods, services, or funds to a specific individual or group of specific individuals? For example, answer "Yes," if goods, services, or funds are provided only for a particular individual, your members, individuals who work for a particular employer, or graduates of a particular school. If "Yes," explain the limitation and how recipients are selected for each program. | ☑ Yes | ☐ No |
| 3 | Do any individuals who receive goods, services, or funds through your programs have a family or business relationship with any officer, director, trustee, or with any of your highest compensated employees or highest compensated independent contractors listed in Part V, lines 1a, 1b, and 1c? If "Yes," explain how these related individuals are eligible for goods, services, or funds. | ☑ Yes | ☐ No |

**Part VII** Your History

The following "Yes" or "No" questions relate to your history. See instructions.

| | | | |
|---|---|---|---|
| 1 | Are you a **successor** to another organization? Answer "Yes," if you have taken or will take over the activities of another organization; you took over 25% or more of the fair market value of the net assets of another organization; or you were established upon the conversion of an organization from for-profit to nonprofit status. If "Yes," complete Schedule G. | ☐ Yes | ☑ No |
| 2 | Are you submitting this application more than 27 months after the end of the month in which you were legally formed? If "Yes," complete Schedule E. | ☐ Yes | ☑ No |

**Part VIII** Your Specific Activities

The following "Yes" or "No" questions relate to specific activities that you may conduct. Check the appropriate box. Your answers should pertain to *past, present, and planned* activities. See instructions.

| | | | |
|---|---|---|---|
| 1 | Do you support or oppose candidates in **political campaigns** in any way? If "Yes," explain. | ☐ Yes | ☑ No |
| 2a | Do you attempt to **influence legislation?** If "Yes," explain how you attempt to influence legislation and complete line 2b. If "No," go to line 3a. | ☐ Yes | ☑ No |
| b | Have you made or are you making an **election** to have your legislative activities measured by expenditures by filing Form 5768? If "Yes," attach a copy of the Form 5768 that was already filed or attach a completed Form 5768 that you are filing with this application. If "No," describe whether your attempts to influence legislation are a substantial part of your activities. Include the time and money spent on your attempts to influence legislation as compared to your total activities. | ☐ Yes | ☑ No |
| 3a | Do you or will you operate bingo or **gaming** activities? If "Yes," describe who conducts them, and list all revenue received or expected to be received and expenses paid or expected to be paid in operating these activities. **Revenue and expenses** should be provided for the time periods specified in Part IX, Financial Data. | ☐ Yes | ☑ No |
| b | Do you or will you enter into contracts or other agreements with individuals or organizations to conduct bingo or gaming for you? If "Yes," describe any written or oral arrangements that you made or intend to make, identify with whom you have or will have such arrangements, explain how the terms are or will be negotiated at arm's length, and explain how you determine or will determine you pay no more than fair market value or you will be paid at least fair market value. Attach copies or any written contracts or other agreements relating to such arrangements. | ☐ Yes | ☑ No |
| c | List the states and local jurisdictions, including Indian Reservations, in which you conduct or will conduct gaming or bingo. | | |

Form 1023 (Rev. 12-2017)    Name: Trinity Healthshare, Inc.    EIN: 83-1050344    Page **6**

**Part VIII    Your Specific Activities** *(Continued)*

**4a** Do you or will you undertake **fundraising?** If "Yes," check all the fundraising programs you do or will conduct. See instructions. ☑ Yes ☐ No

☑ mail solicitations  ☑ phone solicitations
☑ email solicitations  ☐ accept donations on your website
☑ personal solicitations  ☐ receive donations from another organization's website
☐ vehicle, boat, plane, or similar donations  ☐ government grant solicitations
☐ foundation grant solicitations  ☐ Other

Attach a description of each fundraising program.

**b** Do you or will you have written or oral contracts with any individuals or organizations to raise funds for you? If "Yes," describe these activities. Include all revenue and expenses from these activities and state who conducts them. Revenue and expenses should be provided for the time periods specified in Part IX, Financial Data. Also, attach a copy of any contracts or agreements. ☐ Yes ☑ No

**c** Do you or will you engage in fundraising activities for other organizations? If "Yes," describe these arrangements. Include a description of the organizations for which you raise funds and attach copies of all contracts or agreements. ☐ Yes ☑ No

**d** List all states and local jurisdictions in which you conduct fundraising. For each state or local jurisdiction listed, specify whether you fundraise for your own organization, you fundraise for another organization, or another organization fundraises for you.

**e** Do you or will you maintain separate accounts for any contributor under which the contributor has the right to advise on the use or distribution of funds? Answer "Yes" if the donor may provide advice on the types of investments, distributions from the types of investments, or the distribution from the donor's contribution account. If "Yes," describe this program, including the type of advice that may be provided and submit copies of any written materials provided to donors. ☐ Yes ☑ No

**5** Are you **affiliated** with a governmental unit? If "Yes," explain. ☐ Yes ☑ No

**6a** Do you or will you engage in **economic development?** If "Yes," describe your program. ☐ Yes ☑ No
**b** Describe in full who benefits from your economic development activities and how the activities promote exempt purposes.

**7a** Do or will persons other than your employees or volunteers **develop** your facilities? If "Yes," describe each facility, the role of the developer, and any business or family relationship(s) between the developer and your officers, directors, or trustees. ☐ Yes ☑ No

**b** Do or will persons other than your employees or volunteers **manage** your activities or facilities? If "Yes," describe each activity and facility, the role of the manager, and any business or family relationship(s) between the manager and your officers, directors, or trustees. ☐ Yes ☑ No

**c** If there is a business or family relationship between any manager or developer and your officers, directors, or trustees, identify the individuals, explain the relationship, describe how contracts are negotiated at arm's length so that you pay no more than fair market value, and submit a copy of any contracts or other agreements.

**8** Do you or will you enter into **joint ventures,** including partnerships or **limited liability companies** treated as partnerships, in which you share profits and losses with partners other than section 501(c)(3) organizations? If "Yes," describe the activities of these joint ventures in which you participate. ☐ Yes ☑ No

**9a** Are you applying for exemption as a childcare organization under section 501(k)? If "Yes," answer lines 9b through 9d. If "No," go to line 10. ☐ Yes ☑ No

**b** Do you provide childcare so that parents or caretakers of children you care for can be **gainfully employed** (see instructions)? If "No," explain how you qualify as a childcare organization described in section 501(k). ☐ Yes ☐ No

**c** Of the children for whom you provide childcare, are 85% or more of them cared for by you to enable their parents or caretakers to be gainfully employed (see instructions)? If "No," explain how you qualify as a childcare organization described in section 501(k). ☐ Yes ☐ No

**d** Are your services available to the general public? If "No," describe the specific group of people for whom your activities are available. Also, see the instructions and explain how you qualify as a childcare organization described in section 501(k). ☐ Yes ☐ No

**10** Do you or will you publish, own, or have rights in music, literature, tapes, artworks, choreography, scientific discoveries, or other **intellectual property?** If "Yes," explain. Describe who owns or will own any copyrights, patents, or trademarks, whether fees are or will be charged, how the fees are determined, and how any items are or will be produced, distributed, and marketed. ☐ Yes ☑ No

Form 1023 (Rev. 12-2017)    Name: Trinity Healthshare, Inc.    EIN:    83-1060344    Page **7**

| **Part VIII** | **Your Specific Activities** *(Continued)* | | |
|---|---|---|---|

| | | | |
|---|---|---|---|
| 11 | Do you or will you accept contributions of: real property; conservation easements; closely held securities; intellectual property such as patents, trademarks, and copyrights; works of music or art; licenses; royalties; automobiles, boats, planes, or other vehicles; or collectibles of any type? If "Yes," describe each type of contribution, any conditions imposed by the donor on the contribution, and any agreements with the donor regarding the contribution. | ☐ Yes | ☑ No |
| 12a | Do you or will you operate in a **foreign country or countries?** If "Yes," answer lines 12b through 12d. If "No," go to line 13a. | ☐ Yes | ☑ No |
| b | Name the foreign countries and regions within the countries in which you operate. | | |
| c | Describe your operations in each country and region in which you operate. | | |
| d | Describe how your operations in each country and region further your exempt purposes. | | |
| 13a | Do you or will you make grants, loans, or other distributions to organization(s)? If "Yes," answer lines 13b through 13g. If "No," go to line 14a. | ☐ Yes | ☑ No |
| b | Describe how your grants, loans, or other distributions to organizations further your exempt purposes. | | |
| c | Do you have written contracts with each of these organizations? If "Yes," attach a copy of each contract. | ☐ Yes | ☐ No |
| d | Identify each recipient organization and any **relationship** between you and the recipient organization. | | |
| e | Describe the records you keep with respect to the grants, loans, or other distributions you make. | | |
| f | Describe your selection process, including whether you do any of the following. | | |
| | (i)  Do you require an application form? If "Yes," attach a copy of the form. | ☐ Yes | ☐ No |
| | (ii) Do you require a grant proposal? If "Yes," describe whether the grant proposal specifies your responsibilities and those of the grantee, obligates the grantee to use the grant funds only for the purposes for which the grant was made, provides for periodic written reports concerning the use of grant funds, requires a final written report and an accounting of how grant funds were used, and acknowledges your authority to withhold and/or recover grant funds in case such funds are, or appear to be, misused. | ☐ Yes | ☐ No |
| g | Describe your procedures for oversight of distributions that assure you the resources are used to further your exempt purposes, including whether you require periodic and final reports on the use of resources. | | |
| 14a | Do you or will you make grants, loans, or other distributions to foreign organizations? If "Yes," answer lines 14b through 14f. If "No," go to line 15. | ☐ Yes | ☑ No |
| b | Provide the name of each foreign organization, the country and regions within a country in which each foreign organization operates, and describe any relationship you have with each foreign organization. | | |
| c | Does any foreign organization listed in line 14b accept contributions earmarked for a specific country or specific organization? If "Yes," list all earmarked organizations or countries. | ☐ Yes | ☐ No |
| d | Do your contributors know that you have ultimate authority to use contributions made to you at your discretion for purposes consistent with your exempt purposes? If "Yes," describe how you relay this information to contributors. | ☐ Yes | ☐ No |
| e | Do you or will you make pre-grant inquiries about the recipient organization? If "Yes," describe these inquiries, including whether you inquire about the recipient's financial status, its tax-exempt status under the Internal Revenue Code, its ability to accomplish the purpose for which the resources are provided, and other relevant information. | ☐ Yes | ☐ No |
| f | Do you or will you use any additional procedures to ensure that your distributions to foreign organizations are used in furtherance of your exempt purposes? If "Yes," describe these procedures, including site visits by your employees or compliance checks by impartial experts, to verify that grant funds are being used appropriately. | ☐ Yes | ☐ No |

Form **1023** (Rev. 12-2017)

Form 1023 (Rev. 12-2017)    Name: Trinity Healthshare, Inc.    EIN: 83-1050344    Page **8**

| **Part VIII** | **Your Specific Activities** *(Continued)* | | |
|---|---|---|---|
| 15 | Do you have a **close connection** with any organizations? If "Yes," explain. | ☐ Yes | ☑ No |
| 16 | Are you applying for exemption as a **cooperative hospital service organization** under section 501(e)? If "Yes," explain. | ☐ Yes | ☑ No |
| 17 | Are you applying for exemption as a **cooperative service organization of operating educational organizations** under section 501(f)? If "Yes," explain. | ☐ Yes | ☑ No |
| 18 | Are you applying for exemption as a **charitable risk pool** under section 501(n)? If "Yes," explain. | ☐ Yes | ☑ No |
| 19 | Do you or will you operate a **school?** If "Yes," complete Schedule B. Answer "Yes," whether you operate a school as your main function or as a secondary activity. | ☐ Yes | ☑ No |
| 20 | Is your main function to provide **hospital or medical care?** If "Yes," complete Schedule C. | ☐ Yes | ☑ No |
| 21 | Do you or will you provide **low-income housing** or housing for the **elderly or handicapped?** If "Yes," complete Schedule F. | ☐ Yes | ☑ No |
| 22 | Do you or will you provide scholarships, fellowships, educational loans, or other educational grants to individuals, including grants for travel, study, or other similar purposes? If "Yes," complete Schedule H. | ☐ Yes | ☑ No |
| | **Note: Private foundations** may use Schedule H to request advance approval of individual grant procedures. | | |

**Part IX**   Financial Data

For purposes of this schedule, years in existence refer to completed tax years.

1. If in existence less than 5 years, complete the statement for each year in existence and provide projections of your likely revenues and expenses based on a reasonable and good faith estimate of your future finances for a total of:
   a. Three years of financial information if you have not completed one tax year, or
   b. Four years of financial information if you have completed one tax year. See Instructions.

2. If in existence 5 or more years, complete the schedule for the most recent 5 tax years. You will need to provide a separate statement that includes information about the most recent 5 tax years because the data table in Part IX has not been updated to provide for a 5th year. See instructions.

### A. Statement of Revenues and Expenses

| | Type of revenue or expense | Current tax year (a) From 1/1/18 To 12/31/18 | (b) From 1/1/19 To 12/31/19 | (c) From 1/1/20 To 12/31/20 | (d) From To | (e) Provide Total for (a) through (d) |
|---|---|---|---|---|---|---|
| Revenues | 1 Gifts, grants, and contributions received (do not include unusual grants) | 110,000 | 400,000 | 550,000 | | 1,060,000 |
| | 2 Membership fees received | | | | | |
| | 3 Gross investment income | | | | | |
| | 4 Net unrelated business income | | | | | |
| | 5 Taxes levied for your benefit | | | | | |
| | 6 Value of services or facilities furnished by a governmental unit without charge (not including the value of services generally furnished to the public without charge) | | | | | |
| | 7 Any revenue not otherwise listed above or in lines 9–12 below (attach an itemized list) | | | | | |
| | 8 Total of lines 1 through 7 | 110,000 | 400,000 | 550,000 | | 1,060,000 |
| | 9 Gross receipts from admissions, merchandise sold or services performed, or furnishing of facilities in any activity that is related to your exempt purposes (attach itemized list) | | | | | |
| | 10 Total of lines 8 and 9 | 110,000 | 400,000 | 550,000 | | 1,060,000 |
| | 11 Net gain or loss on sale of capital assets (attach schedule and see instructions) | | | | | |
| | 12 Unusual grants | | | | | |
| | 13 Total Revenue Add lines 10 through 12 | 110,000 | 400,000 | 550,000 | | 1,060,000 |
| Expenses | 14 Fundraising expenses | 2,500 | 7,500 | 7,500 | | |
| | 15 Contributions, gifts, grants, and similar amounts paid out (attach an itemized list) | | | | | |
| | 16 Disbursements to or for the benefit of members (attach an itemized list) | 45,000 | 195,000 | 210,000 | | |
| | 17 Compensation of officers, directors, and trustees | 30,000 | 125,000 | 125,000 | | |
| | 18 Other salaries and wages | | | 30,000 | | |
| | 19 Interest expense | | | | | |
| | 20 Occupancy (rent, utilities, etc.) | | 5,100 | 5,100 | | |
| | 21 Depreciation and depletion | | | | | |
| | 22 Professional fees | 15,000 | 10,000 | 10,000 | | |
| | 23 Any expense not otherwise classified, such as program services (attach itemized list) | | | | | |
| | 24 Total Expenses Add lines 14 through 23 | 92,500 | 442,600 | 487,600 | | |

Form 1023 (Rev. 12-2017)    Name: Trinity Healthshare, Inc.    EIN: 83-1050344    Page **10**

## Part IX    Financial Data *(Continued)*

### B. Balance Sheet (for your most recently completed tax year)

Year End: (Whole dollars)

**Assets**

| | | |
|---|---|---|
| 1 | Cash | 1 | n/a |
| 2 | Accounts receivable, net | 2 | |
| 3 | Inventories | 3 | |
| 4 | Bonds and notes receivable (attach an itemized list) | 4 | |
| 5 | Corporate stocks (attach an itemized list) | 5 | |
| 6 | Loans receivable (attach an itemized list) | 6 | |
| 7 | Other investments (attach an itemized list) | 7 | |
| 8 | Depreciable and depletable assets (attach an itemized list) | 8 | |
| 9 | Land | 9 | |
| 10 | Other assets (attach an itemized list) | 10 | |
| 11 | Total Assets (add lines 1 through 10) | 11 | |

**Liabilities**

| | | |
|---|---|---|
| 12 | Accounts payable | 12 | |
| 13 | Contributions, gifts, grants, etc. payable | 13 | |
| 14 | Mortgages and notes payable (attach an itemized list) | 14 | |
| 15 | Other liabilities (attach an itemized list) | 15 | |
| 16 | Total Liabilities (add lines 12 through 15) | 16 | |

**Fund Balances or Net Assets**

| | | |
|---|---|---|
| 17 | Total fund balances or net assets | 17 | |
| 18 | Total Liabilities and Fund Balances or Net Assets (add lines 16 and 17) | 18 | |
| 19 | Have there been any substantial changes in your assets or liabilities since the end of the period shown above? If "Yes," explain. | ☐ Yes  ☑ No |

## Part X    Public Charity Status

Part X is designed to classify you as an organization that is either a **private foundation** or a **public charity**. Public charity status is a more favorable tax status than private foundation status. If you are a private foundation, Part X is designed to further determine whether you are a **private operating foundation**. See instructions.

**1a** Are you a private foundation? If "Yes," go to line 1b. If "No," go to line 5 and proceed as instructed. If you are unsure, see the instructions.    ☐ Yes  ☑ No

**b** As a private foundation, section 508(e) requires special provisions in your organizing document in addition to those that apply to all organizations described in section 501(c)(3). Check the box to confirm that your organizing document meets this requirement, whether by express provision or by reliance on operation of state law. Attach a statement that describes specifically where your organizing document meets this requirement, such as a reference to a particular article or section in your organizing document or by operation of state law. See the instructions, including Appendix B, for information about the special provisions that need to be contained in your organizing document. Go to line 2.    ☐

**2** Are you a private operating foundation? To be a private operating foundation you must engage directly in the active conduct of charitable, religious, educational, and similar activities, as opposed to indirectly carrying out these activities by providing grants to individuals or other organizations. If "Yes," go to line 3. If "No," go to the signature section of Part XI.    ☐ Yes  ☐ No

**3** Have you existed for one or more years? If "Yes," attach financial information showing that you are a private operating foundation; go to the signature section of Part XI. If "No," continue to line 4.    ☐ Yes  ☐ No

**4** Have you attached either (1) an affidavit or opinion of counsel, (including a written affidavit or opinion from a certified public accountant or accounting firm with expertise regarding this tax law matter), that sets forth facts concerning your operations and support to demonstrate that you are likely to satisfy the requirements to be classified as a private operating foundation; or (2) a statement describing your proposed operations as a private operating foundation?    ☐ Yes  ☐ No

**5** If you answered "No" to line 1a, indicate the type of public charity status you are requesting by checking one of the choices below. You may check only one box.

The organization is not a private foundation because it is:

**a** 509(a)(1) and 170(b)(1)(A)(i)—a church or a convention or association of churches. Complete and attach Schedule A.    ☐

**b** 509(a)(1) and 170(b)(1)(A)(ii)—a **school**. Complete and attach Schedule B.    ☐

**c** 509(a)(1) and 170(b)(1)(A)(iii)—a **hospital**, a cooperative hospital service organization, or a medical research organization operated in conjunction with a hospital. Complete and attach Schedule C.    ☐

**d** 509(a)(3)—an organization supporting either one or more organizations described in line 5a through c, f, h, or i or a publicly supported section 501(c)(4), (5), or (6) organization. Complete and attach Schedule D.    ☐

Form 1023 (Rev. 12-2017)    Name: Trinity Healthshare, Inc.    EIN: 83-1050344    Page **11**

| Part X | Public Charity Status *(Continued)* |
|---|---|

**e** 509(a)(4) – an organization organized and operated exclusively for testing for public safety. ☐

**f** 509(a)(1) and 170(b)(1)(A)(iv) – an organization operated for the benefit of a college or university that is owned or operated by a governmental unit. ☐

**g** 509(a)(1) and 170(b)(1)(A)(ix) – an agricultural research organization directly engaged in the continuous active conduct of agricultural research in conjunction with a college or university. ☐

**h** 509(a)(1) and 170(b)(1)(A)(vi) – an organization that receives a substantial part of its financial support in the form of contributions from publicly supported organizations, from a governmental unit, or from the general public. ☑

**i** 509(a)(2) – an organization that normally receives not more than one-third of its financial support from gross **investment income** and receives more than one-third of its financial support from contributions, membership fees, and gross receipts from activities related to its exempt functions (subject to certain exceptions). ☐

**j** A publicly supported organization, but unsure if it is described in 5h or 5i. You would like the IRS to decide the correct status. ☐

**6** If you checked box h, i, or j in question 5 above, and you have been in existence more than 5 years, you must confirm your public support status. Answer line 6a if you checked box h in line 5 above. Answer line 6b if you checked box i in line 5 above. If you checked box j in line 5 above, answer both lines 6a and 6b.

   **a** **(i)** Enter 2% of line 8, column (e) on Part IX-A Statement of Revenues and Expenses _____

      **(ii)** Attach a list showing the name and amount contributed by each person, company, or organization whose gifts totaled more than the 2% amount. If the answer is "None," state this.

   **b** **(i)** For each year amounts are included on lines 1, 2, and 9 of Part IX-A Statement of Revenues and Expenses, attach a list showing the name and amount received from each **disqualified person**. If the answer is "None," state this.

      **(ii)** For each year amounts were included on line 9 of Part IX-A Statement of Revenues and Expenses, attach a list showing the name of and amount received from each payer, other than a disqualified person, whose payments were more than the larger of (1) 1% of Line 10, Part IX-A Statement of Revenues and Expenses, or (2) $5,000. If the answer is "None," state this.

**7** Did you receive any unusual grants during any of the years shown on Part IX-A Statement of Revenues and Expenses? If "Yes," attach a list including the name of the contributor, the date and amount of the grant, a brief description of the grant, and explain why it is unusual. ☐ **Yes** ☑ **No**

| Part XI | User Fee Information and Signature |
|---|---|

You must include the correct user fee payment with this application. If you do not submit the correct user fee, we will not process the application and we will return it to you. Your check or money order must be made payable to the United States Treasury. User fees are subject to change. Check our website at *www.irs.gov* and type "Exempt Organizations User Fee" in the search box, or call Customer Account Services at 1-877-829-5500 for current information.

Enter the amount of the user fee paid: $600

I declare under the penalties of perjury that I am authorized to sign this application on behalf of the above organization and that I have examined this application, including the accompanying schedules and attachments, and to the best of my knowledge it is true, correct, and complete.

**Please Sign Here** ▶

| (Signature of Officer, Director, Trustee, or other authorized official) | William H. Thomas III (Type or print name of signer) | 6-28-18 (Date) |
|---|---|---|
| | Chairman (Type or print title or authority of signer) | |

# 4a

# Additional Information

Trinity Healthshare, Inc.
EIN: 83-1050344

**Attachment to Form 1023**
**Application for Recognition of Exemption**
**under Section 501(c)(3) of the Internal Revenue Code**

**TRINITY HEALTHSHARE, INC.**
**EIN: 83-1050344**

---

### Part I, Question 7 – Legal Assistance

Jennifer Moseley has provided her services to Trinity Healthshare, Inc. Her office is located at 171 17th Street NW, Suite 1100, Atlanta, GA 30363. She has assisted in the preparation of Form 1023 and attachments. However, as of this date, Jennifer has not charged the entity for her services.

### Part I, Question 11 – Date of Formation

Trinity Healthshare, Inc. became incorporated on June 27, 2018, but the Baptist church has been sharing health care needs since the sixteenth century. Trinity Healthshare, Inc. is carrying on the health care sharing tradition of its Baptist predecessors.

### Part IV – Narrative Description of Activities

Trinity Healthshare, Inc. is a traditional Baptist sharing entity which is carrying on the longstanding Baptist tradition of sharing and bearing healthcare needs. Trinity Healthshare, Inc. was formed by members of the church to support the needs of missionaries, volunteers, and employees of nonprofit ministries. The members of Trinity Healthshare, Inc. share a common set of ethical or religious beliefs and their medical expenses are shared in accordance with those beliefs.

Trinity Healthshare, Inc. strives to protect and conserve the biblical traditions of the original Baptist movement which began during the persecutions of Europe in the sixteenth century. Trinity Healthshare, Inc. provides no-cost or low-cost health care sharing support especially for Baptists, or persons who share in the same beliefs, which are missionaries, volunteers, or employees of faith based churches or ministries. Trinity Healthshare, Inc. coordinates sharing contributions from within the Baptist community to make this possible.

Additionally, the judiciary has specifically confirmed the tax-exempt status of traditional Anabaptist Health Care Sharing Ministries ("Medical Aid Plans"). For example, in *Bethel Conservative Mennonite Church v. Comm'r*, 746 F.2d 388 (7th Cir. 1984), the U.S. Court of Appeals found that a Mennonite church whose members pooled funds to share each other's medical needs was exempt from taxation under §§ 501(a) and 501(c)(3). The participants of Trinity Healthshare, Inc. share a common set of ethical and religious beliefs and their medical expenses are shared in accordance with those beliefs. There are common characteristics and traditions shared by many Baptist congregations.

One unifying similarity among Baptists is adherence to the New Testament.

> We also believe and confess that before His ascension He instituted His New Testament, and, since it was to be and remain an eternal Testament, that He confirmed and sealed the same with His precious blood, and gave and left it to His disciples, yea, charged them so highly with it, that neither angel nor man may alter it, nor add to it nor take away from

1

Trinity Healthshare, Inc.
EIN: 83-1050344

it; and that He caused the same, as containing the whole counsel and will of His heavenly Father, as far as is necessary for salvation to be proclaimed in His name by His beloved apostles, messengers, and ministers -- whom He called, chose, and sent into all the world for that purpose -- among all peoples, nations, and tongues; and repentance and remission of sins to be preached and testified of; and that He accordingly has therein declared all men without distinction, who through faith, as obedient children, heed, follow, and practice what the same contains, to be His children and lawful heirs; thus excluding no one from the precious inheritance of eternal salvation, except the unbelieving and disobedient, the stiff-necked and obdurate, who despise it, and incur this through their own sins, thus making themselves unworthy of eternal life.

Baptists can trace their origins all the way back to Martin Luther and the Reformation in Europe in the sixteenth century, by John Smyth, who arose out of that transitional time and was considered to be part of the Radical Reformation.

Martin Luther began a German reformation movement in 1517 by nailing his ninety-five theses to the door of the Castle Church of Wittenberg. This Reformation challenged the hierarchies and doctrines of the official state church in that era. Members of the Reformation objected to state church practices such as the selling of indulgences by church clergy, and desired to have the Bible fully translated into their own language so that every common person could read it.

As the Reformation progressed and expanded, several student ministers in the Reformation began studying the Scriptures for themselves and began to develop their own religious convictions. They became dissatisfied with the Reformation movement, but they also objected to the nature and hierarchy of the official state church. They particularly denounced the state church practice of infant baptism, and they began the practice of rebaptism for Christians who wished to publicly express their faith after becoming adults.

The Baptist denomination was founded by John Smyth in 1609. It started as a "Seperatist" movement from the Church of England or Anglican Church in Lincolnshire and then moved to Holland. With his colleague, Thomas Helwys, he chose to be "Baptised" as adults into Christ. Smyth then moved back to England and joined the Waterlander Mennonites and was thereafter identified with the Radical Reformation movement. His Colleague Helwys was disillusioned with Smyth's choice not to break with the past and he moved back to England and formed the first Baptist gathering on English soil in London in 1612.

Sadly, many Baptists have paid for their ethical and religious beliefs with their lives. Most historians state, in fact, that the history of the Baptists is a history of persecution. The sixteenth century official state church viewed the Baptist movement as a theological and political threat to its existence, and it began persecuting and killing Baptists for their faith. In England, the early Baptists were persecuted. John Bunyan, the Baptist author of *The Pilgrim's Progress,* for example, wrote his book while imprisoned for his unauthorized preaching.

During persecution, Baptists held church services in secret, clinging to their ethical and religious beliefs to the death. For some, it meant burning at the stake. It was in this closely-knit circle of persecuted believers that the concept of caring for one another

Trinity Healthshare, Inc.
EIN: 83-1050344

was transfused into the lifeblood of the Baptist faith.

Those early Baptists believed in a literal interpretation of the Bible and as they read and studied the Scriptures, they developed unparalleled ethical and religious convictions, embracing as one of their core beliefs that they should care for one another.

The ancestry of nearly every member of the Baptist or Anabaptist association of churches can be directly traced to European countries such as Germany, Switzerland, or the Netherlands. Their ancestors fled successive persecutions in search of a country where they could peaceably assemble without the need for secrecy or catacombs.

After five centuries of this faith tradition and the refining fire of persecution for that faith, the members of the Baptist association of churches still believe in a literal interpretation of the Bible. They still believe that caring for one another can and should include sharing one another's needs. When Jesus said to "Love your neighbor as yourself," members of the Baptist association of churches believe that Jesus was commanding them to care for one another.

One scriptural expression of their beliefs is found in Galatians 6:2 which says Christians are to, "Bear one another's burdens, and so fulfil the law of Christ."

Baptists believe in caring for each and every member, including those with pre-existing medical conditions. Many traditional Baptists believe they are following the teachings of Jesus by sharing and "bearing" one another's healthcare needs. The Baptists bore one another's burdens in Europe in the sixteenth century, and Baptists still believe in sharing one another's health care burdens.

Trinity Healthshare, Inc. wishes to continue the centuries-old Baptist tradition of health care sharing and to "so fulfill the law of Christ." The core ethical beliefs of traditional Baptists mobilize their actions, and they relate to one another in community because of them.

Baptists and many other Christian denominations have been sharing in each other's needs medical expenses since the sixteenth century. They have not only shared medical expenses since before 1999, they have shared medical expenses since the 1600's. The Baptist association of churches has formally been in existence since the early 1600's. Baptist members have created Trinity Healthshare, Inc. to be a health care sharing vehicle for missionaries, volunteers, and employees of faith based nonprofit ministries, and those who adhere to its Statement of Beliefs.

Coordinating sharing is today a core function of a local church just the same as it was in Jerusalem, Rome, and Philippi or for the Moravians during the Reformation. That concept of mutual sharing among churches is woven throughout the New Testament with one of the most succinct descriptions of it being found at II Corinthians 8:13-15 in which the Apostle Paul states, "Our desire is not that others might be relieved while you are hard pressed, but that there might be equality. At the present time your plenty will supply what they need, so that in turn their plenty will supply what you need. The goal is equality, as it

is written: 'The one who gathered much did not have too much, and the one who gathered little did not have too little.'"[1]

The Baptist association of churches has been an active, functioning group of churches since the early 17th century. These churches are exempt from taxation under § 501(a).

Trinity Healthshare, Inc. is comprised of traditional faith based ministers and those who adhere to the Statement of Beliefs contained within its Bylaws. Trinity

Trinity Healthshare, Inc.
EIN: 83-1050344

Healthshare, Inc. is appropriate to be recognized as a 501(c)(3) entity by the Internal Revenue Service.

**Part V, Question 1a – Name, Title, Mailing Address and Compensation for Officers, Directors and Trustees**
William H. Thead III – Chairman, Director, and Ordained Minister
860 Johnson Ferry Road, Suite 140-106
Atlanta, GA 30342
No compensation has been paid at this time. However, an annual salary for the administrator of the plan is projected at $30,000 for 2018, as it is a partial year, and $125,000 for 2019.

David R. Thead – Secretary, Treasurer, and Director
2343 Sherbrooke Drive NE
Atlanta, GA 30345
No compensation.

**Part V, Question 2a – Family or Business Relationships**
There is a familial relationship between William H. Thead III (brother) and David R. Thead (brother).

---

[1] See also, Romans 15:24-26, in which the Apostle Paul discusses sharing among the churches: "[W]henever I journey to Spain, I shall come to you. For I hope to see you on my journey, and to be helped on my way there by you, if first I may enjoy your company for a while. But now I am going to Jerusalem to minister to the saints. For it pleased those from Macedonia and Achaia to make a certain contribution for the poor among the saints who are in Jerusalem."

Trinity Healthshare, Inc.
EIN: 83-1050344


**Part V, Question 3a – Duties and Qualifications of Officers and Directors**
William H. Thead III – Chairman, Director, and Ordained Minister
- Qualifications: William Thead is an ordained minister and has been serving the church for over 20 years. His business career has been working in sales in his family business. For over 25 years, will also serve as a layperson in the church.
- Duties: As Chairman of the Board of Directors, William serves as the leader of the Board, presides at all Board meetings, ensures that Board decisions are implemented, and provides executive supervision over the entity's activities and personnel. He also processes medical bills, corresponds with care providers, raises funds, provides assistance for new and existing members, prepares financial statements, and ensures the entity's solvency.
- Average hours worked: William may work up to 40 hours per week by 2019.


David R. Thead – Secretary, Treasurer, and Director
- Qualifications: David Thead works as a manager of a metal fabrication manufacturer.
- Duties: As Secretary, David is responsible for the records of Trinity Healthshare, Inc. He is responsible for official minute records of meetings, voting on decisions affecting the entity, negotiating medical bills with providers, and helping ensure financial solvency.
- Average hours worked: David may work up to 4 hours per week by 2019.


**Part V, Question 5a – Conflict of Interest Policy**
     The Board of Directors of the Corporation adopted a Conflict of Interest Policy by vote on May 26, 2015. A copy of the Conflict of Interest Policy is attached.


**Part V, Question 9a – Agreements**
     Trinity Healthshare, Inc. will seek contributions from Baptist entities and individuals to support the entity, including William's current employer.


**Part VI, Question 1a – Provision of Goods, Services or Funds to Individuals**
     The Baptists have been sharing one another's health care needs since the sixteenth century. Baptists formed Trinity Healthshare, Inc. to provide a health care sharing vehicle for the members of faith based nonprofit ministries. In accordance with their longstanding Baptist heritage and tradition, the Baptists believe that they are following the teachings of Jesus by bearing one another's health care burdens.[2]
     Trinity Healthshare, Inc. coordinates contributions from within the Baptist community to help cover the health care needs of missionaries, volunteers, and employees of faith based nonprofit ministries. When a member of Trinity Healthshare, Inc. has a need, they will be able to submit their health care bills to the Board of Directors, or its designees, for evaluation. In accordance with its guidelines, the Board of Directors will channel shared funds to the members in need.

---

[2] See, Matthew 22:39, "Love your neighbor as yourself." See also, Philippians 2:4, "Look not every man on his own things, but every man also on the things of others."

Trinity Healthshare, Inc.
EIN: 83-1050344

**Part VI, Question 2 – Limitation to a Specific Group**

Participation in this health care sharing ministry Corporation is limited to missionaries, volunteers, and employees of faith based nonprofit ministries, and those who adhere to its Statement of Beliefs.

**Part VI, Question 3 – Benefits to Officers, Directors, and Family Members**

This health care sharing ministry Corporation exists for the benefit of all missionaries, volunteers, and employees of faith based nonprofit ministries, especially Baptist nonprofit ministries. The medical expenses of its members will be charitably and religiously shared in accordance with the Baptist and or Christian health care sharing tradition.

The Corporation's directors and officers are eligible to participate in the Corporation and will be subject to the same terms and conditions as its members. Individuals who have a family or business relationship with directors or officers will be eligible to share health care expenses just like other participants of the Corporation. No special consideration will be given to individuals with family or business relationships, and the Conflict of Interest Policy exists to prevent unequal treatment of participants (See attached "Conflict of Interest Policy").

**Part VIII, Question 4a – Fundraising**

The Corporation will be operated exclusively by members of a Christian church, or persons sharing in the same beliefs, and it will be funded by accepting contributions and coordinating sharing within the Christian community, or person whom shares in the same beliefs. It does not intend to solicit funds outside of the Christian community. It will inform businesses and individuals within the Baptist community if it has a deficit or financial need in covering the medical bills of its members. The entity does not have a website at this time, but it may set up a website in the future with an option to donate.

**Part VIII, Question 4d – Fundraising**

Large populations of Baptists exist all over the United States. The Corporation does not conduct fundraising for other entities.

**Part VIII, Question 11 – Other Gifts**

The Corporation does not accept non-cash gifts at this time. It may eventually expand its gift acceptance policies to include real property or other liquefiable gifts, if possible to do so within IRS guidelines.

**Part VIII, Question 12a – Foreign Countries**

The Corporation does not operate or exist in foreign countries. However, Baptist missionaries may incur medical expenses in foreign countries, and the Corporation may directly cover those medical expenses or reimburse the missionaries.

**Part VIII, Question 15 – Close Connection with other Organizations**

The Corporation has a close connection with the Baptist church constituency (See above, "Part IV – Narrative Description of Activities").

Trinity Healthshare, Inc.
EIN: 83-1050344

**Part IX, Section A – Projections for Statement of Revenues and Expenses**
  Trinity Healthshare, Inc. became incorporated on June 27, 2018. Therefore, it is applying for 501(c)(3) status as a "newly formed" entity, and the Corporation has provided good faith projections of its revenues and expenses for 2018, 2019, and 2020.

**Part X, Questions 6(b)(i), (ii)**
See above, Part VI, Question 3.

# 5

# Certificate of Incorporation

# Delaware

### The First State

Page 1

 

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF INCORPORATION OF "TRINITY HEALTHSHARE, INC.", FILED IN THIS OFFICE ON THE TWENTY-SEVENTH DAY OF JUNE, A.D. 2018, AT 9:49 O'CLOCK A.M.

A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE NEW CASTLE COUNTY RECORDER OF DEEDS.



Jeffrey W. Bullock, Secretary of State

6951163  8100
SR# 20185385351

Authentication: 202966193
Date: 06-27-18

You may verify this certificate online at corp.delaware.gov/authver.shtml

State of Delaware
Secretary of State
Division of Corporations
Delivered 09:49 AM 06/27/2018
FILED 09:49 AM 06/27/2018
SR 20185385351 - File Number 6961163

## CERTIFICATE OF INCORPORATION

### OF

## TRINITY HEALTHSHARE, INC.
### (A Non-Stock Corporation)

The undersigned, acting as incorporator of a corporation under the provisions of the General Corporation Law of the State of Delaware, hereby certifies that:

**FIRST:** The name of the corporation (hereinafter called "Corporation") is Trinity Healthshare, Inc.

**SECOND:** The address, including street, number, city and county, of the registered office of the Corporation in the State of Delaware is Corporation Trust Center, 1209 Orange Street, in the City of Wilmington, County of New Castle, 19801. The name of the registered agent of the Corporation in the State of Delaware at such address is The Corporation Trust Company.

**THIRD:** The Corporation is organized exclusively for charitable and religious purposes under section 501(c)(3) of the Internal Revenue Code, or corresponding section of any future federal tax code. No part of the net earnings of the' Corporation shall inure to the benefit of, or be distributed to its participants, directors, officers, or other private persons, except that the Corporation shall be authorized and empowered to pay any reasonable compensation for services rendered and to make payments and distributions in furtherance of the exempt purposes set forth herein. No substantial part of the activities of the Corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation, and the Corporation shall not participate in, or intervene in (including the publishing or distribution of statements) any political campaign on behalf of or in opposition to any candidate for public office. Notwithstanding any other provision of this Certificate of Incorporation, the Corporation shall not carry on any other activities not permitted to be carried on (a) by an organization exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code, or the corresponding section of any future federal tax code, or (b) by an organization, contributions to which are deductible under section 170(c)(2) of the Internal Revenue Code, or the corresponding section of any future federal tax code.

**FOURTH:** The Corporation shall not have any capital stock.

**FIFTH:** The conditions of membership for the Corporation shall be stated in the Bylaws of the Corporation.

**SIXTH:** Upon dissolution of the Corporation, all assets shall be distributed for one or more exempt purposes within the meaning of section 501(c)(3) of the Internal Revenue Code, or corresponding section of any future federal tax code, or shall be distributed to the federal government, or to a state or local government for a public purpose. Any such assets not so disposed of shall be disposed of by a court of competent jurisdiction of the county in which the principal office of the Corporation is then located, exclusively for such purposes or to such organization or organizations, as said court shall determine, which are organized and operated exclusively for such purposes.

31835237 v1

**SEVENTH:**  A director of the Corporation shall not be personally liable to the Corporation for monetary damages for breach of fiduciary duty as a director except for liability (i) for any breach of the director's duty of loyalty to the Corporation; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of the General Corporation Law of the State of Delaware; or (iv) for any transaction from which the director derived any improper personal benefit.  Neither the repeal or the modification of this Article SEVENTH nor the adoption of any provisions of the Certificate of Incorporation of the Corporation inconsistent with this Article SEVENTH shall adversely affect the rights of any director of the Corporation with respect to any matter occurring, or any cause of action, suit or claim that, but for this Article SEVENTH, would accrue or arise, prior to such repeal, modification or adoption of an inconsistent provision.

**EIGHT:**     The name and mailing address of the sole incorporator of the Corporation is as follows:

| Name | Mailing Address |
|---|---|
| Christy Floyd | 420 North 20th Street<br>Suite 3400<br>Birmingham, Alabama 35203 |

Dated the 27th day of June, 2018.

_____
Christy Floyd, Incorporator

# 6

# Bylaws

<u>BYLAWS</u>
### FOR TRINITY HEALTHSHARE, INC.

## ARTICLE I
#### IDENTIFICATION

**Section 1.    Name.** The name of this corporation shall be Trinity Healthshare, Inc.

**Section 2.    Office.** The principal office of this Corporation shall be in Atlanta, Georgia.

**Section 3.    Fiscal Year.** The fiscal year of the Corporation shall begin on the first day of January each year and end on the last day of December in the same year.

**Section 4. Management.** The governing or legislative body of this Corporation shall be a Board of Directors initially appointed by the incorporator of Trinity Healthshare, Inc., as may be provided in these bylaws. Successor board members will be appointed by the Board of Directors of Trinity Healthshare, Inc. The day to day activities of the Corporation shall be carried on by the Chairman and Secretary of the Corporation, and such other Officers as the Board of Directors may appoint.

**Section 5. Funds.** The assets of this Corporation shall be kept upon the books thereof in one fund or in segregated funds as the Board of Directors may prescribe.

**Section 6.    Private Property Exempt.** The private property of all participants, Officers, and Directors of this Corporation shall be exempt from the corporate liabilities.

## ARTICLE II
#### PURPOSE

**The purpose** for the formation of this Corporation is to enable the community to bear and to assist in sharing one another's burdens and:

In Galatians 6:2 the Apostle Paul instructs believers to, "Bear one another's burdens, and so fulfill the law of Christ." II Corinthians 8:14 further explains, "At the present time your plenty will supply what they need, so that in turn their plenty will supply what you need."

1.    **To associate** within the faithful community for medical-sharing, physical needs-sharing, financial stewardship, and faithful charitable purposes and in accordance with the Bylaws of this organization and the laws of the state or states wherein this Corporation may be doing business.

2.    **To promote** the historical, biblical concept of mutual aid sharing, practiced among the community as it relates to the health and wellbeing, to the financial and spiritual needs of its community members.

3.    **To create funds** from its activities and to maintain and invest its funds; and to disburse and apply its funds among the aged, children disabled or sick among its members in accordance with the laws of the state or states wherein this Corporation may be doing business.

4.    **To remain faithful** to this Statement of Faith: We believe the Bible alone is the inspired Word of God; therefore it is the final and only source of absolute spiritual authority.

We believe in the triune God of the Bible. He is one God who is revealed in three distinct Persons - God, the Father; God, the Son; and God, the Holy Spirit.

We believe Jesus Christ was God in the flesh - fully God and fully man. He was born of a virgin, lived a sinless life, died on the cross to pay the penalty for our sins, was bodily resurrected on the third day, and now is seated in the heavens at the right hand of God, the Father.

We believe that all people are born with a sinful nature and can be saved from eternal death only by grace alone, through faith alone, trusting only in Christ's atoning death and resurrection to save us from our sins and give us eternal life.

We believe in the bodily resurrection of all who have put their faith in Jesus Christ.

All we believe and do is for the glory of God alone.

## ARTICLE III

### MEMBERSHIP

**Section 1. Age and Gender.** Membership shall not be limited on the basis age or gender. Membership is limited to traditional believers who are volunteers, missionaries, or employees of nonprofit Trinity Healthshare, Inc. ministries, and those who prescribe to the Statement of beliefs at Article II, Section 4, and prescriptions for living a full, healthy and personally spiritual life as contained in the bible and holy writings.

**Section 2. Dependents.** Dependents of members of the faith based Trinity Healthshare, Inc. may be included in the Corporation in accordance with the rules and regulations as set forth by the Board of Directors, but they shall have no voting rights.

**Section 3. Voting.** The members of the Corporation shall not have voting rights unless given voting rights by the Board of Directors.

**Section 4. Application.** Admission to participation in the Corporation shall be made according to the rules, regulations and restrictions fixed from time to time by the Board of Directors.

## ARTICLE IV

### ORGANIZATION

**Section 1. Day-to-Day Management.** The day-to-day management of the Corporation has been delegated by the Board of Directors to a governing body known as the Officers of the Corporation, which shall initially consist of a Chairman and Secretary. The Board of Directors has the authority to appoint additional Officers at any time.

## ARTICLE V

### BOARD OF DIRECTORS

**Section 1. Number and Term of Office.** The minimum number of operating directors shall be two, and may be increased by the Board of Directors. The Board of Directors may also create an Advisory Board from within the faithful community or from outside the community to provide spiritual oversight and financial accountability for the organization. The directors' terms shall be staggered so that only one director's term may expire each year.

**Section 2. Method of Selection.** The legislative body of this Corporation shall be a Board of Directors initially appointed by the incorporator of Trinity Healthshare, Inc. Successor board members may be appointed by the Board of Directors of Trinity Healthshare, Inc. as the terms for the incumbent members of the Board of Directors expire or become vacant. Nominees will be taken from the Board of Directors, and voted upon by the Board of Directors. The persons receiving the most votes shall fill the positions on the Board of Directors.

**Section 3. Duties.** The corporate power shall be vested in the Board of Directors who shall have the management and control of the business of the Corporation. They shall employ such agents, representatives and persons as they may deem advisable.

**Section 4.    Officers of the Board.** The members of the Board of Directors shall elect the Chairman of the Board, Secretary of the Board, and any other Officer positions established by the Board of Directors, at scheduled Board of Directors meetings. Such officers shall have duties as assigned by the Board of Directors.

**Section 5. Resignation.** A Director may resign at any time by filing a written resignation with the Chairman. The nomination and election process of Section 2 shall be used to fill that unexpired term.

**Section 6. Salary.** The Board of Directors may receive reasonable compensation from the Corporation, and the Board of Directors may establish policies providing for the payment of traveling expenses and other expenses incurred by directors in attending board meetings or otherwise performing their duties.

**Section 7. Annual Meetings.** The date of the regular annual meeting of the Board of Directors shall normally be in the month of February, with the exact date and hour to be designated by the Chairman or Secretary of the Board. The annual meeting of the Board of Directors shall be at a home office, or by telephone, or at such other place as the Chairman or Secretary of the Board may specify.

**Section 8. Other Meetings.** Other meetings of the Board of Directors may be held upon the call of the Chairman or Secretary at any time or place upon proper notice given to each director, specifying the general purpose of the meeting.

**Section 9. Voting.** On matters requiring a vote from the Board of Directors, the board must meet in person, thereafter, votes may be taken by email, phone, ballot, or any other reasonable method, if the method is in accordance with applicable law.

3

**Section 10. Quorum.** At any meeting of the Board of Directors, the presence of a majority of the members of the Board shall constitute a quorum for the transaction of any business.

**Section 11. Committees.** The Board of Directors may, from time to time, appoint such standing and special committees as may be deemed necessary and advisable.

**Section 12. Proxy Voting.** Proxy voting shall not be allowed by Directors.

## ARTICLE VI

### OFFICERS OF THE CORPORATION

**Section 1. Officers.** At the Annual Meeting of the Board of Directors, they shall appoint officers of this Corporation and shall function according to the policies and directives set forth by the Board of Directors; The Board of Directors may from time to time create other offices with designation of duties and shall appoint persons to fill such offices.

**Section 2. Chairman.** The Chairman shall preside at all meetings of the Board. He shall fairly present all matters of business and perform the duties assigned to him by the Board of Directors.

**Section 3. Secretary.** The Secretary shall have custody of the official records of the Corporation. He shall keep the official minute records of all the meetings of the Board of Directors and its committees, and shall perform such other duties as the Board of Directors may from time to time determine. He shall give the required notice of annual and special meetings of the Board of Directors with the advice and consent of the Chairman of the Board. The duties of the Secretary may be performed by one or more assistant Secretaries appointed by the Board of Directors.

**Section 4.    Vacancies.** All vacancies of officers of the Corporation shall be filled by a special meeting of the Board of Directors.

**Section 5. Legal Documents.** All legal documents and checks, drafts, notes and orders for the payment of money shall be signed by those officers or employees of the Corporation as the Board of Directors may from time to time designate.

**Section 6. Loans to Officers.** No loan of money or property or any advance because of services to be performed in the future shall be made to any officer or director of the corporation except for travel advances under such conditions which the Board of directors may determine.

## ARTICLE VII

### INDEMNIFICATION OF DIRECTORS, OFFICERS AND EMPLOYEES

The Corporation shall indemnify any person made a party to any claim, action, suit or proceeding (civil, criminal or administrative) because he is or was a Director, Officer or employee of the Corporation or of any corporation (for profit or not for profit), partnership, association, trust, foundation, or other organization or entity

4

where he served at the request of the Corporation, against the reasonable expenses, including attorneys' fees actually and reasonably incurred by him in connection with the defense of such claim, action, suit or proceeding, or in connection with any appeal therein, except in relation to matters as to which it shall be adjudged therein that such Director, Officer, or employee is liable for negligence, misconduct or wrongdoing in the performance of his duties. The standard of conduct required shall be that such person acted in good faith for a purpose which he reasonably believed to be in the best interests of the Corporation, and, in addition, in any criminal action or proceeding, had no reasonable cause to believe that his conduct was unlawful. Expenses, as aforesaid, shall also include but not be limited to, disbursements and amounts of judgments, fines or penalties incurred by or imposed upon him in connection with any such claim, action, suit or proceeding. The Corporation may also reimburse to any such Director, Officer or employee the reasonable costs of settlement of any such claim, action, suit or proceeding if it shall be found by a majority of a committee composed of the Directors not involved in the matter in controversy (whether or not a quorum) or by a committee of disinterested persons appointed by the Directors, that it was to the best interests of the Corporation that such settlement be made and that such Director, Officer or employee was not guilty of negligence or misconduct or wrongdoing under the standards aforesaid.

## ARTICLE VIII

### AMENDMENTS

These bylaws may be amended, repealed or added to at any regular meeting (or at any special meeting of the Board of Directors called for that purpose) by unanimous vote of the Board of Directors. No amendment, repeal or addition shall be considered unless notice of the proposed amendment, repeal or addition is submitted to the members of the Board of Directors at least 30 days in advance of such meeting.

## ARTICLE IX

### TAX-EXEMPT PURPOSE

The Corporation is organized exclusively for charitable and religious purposes under section 501(c)(3) of the Internal Revenue Code, or corresponding section of any future federal tax code. No part of the net earnings of the Corporation shall inure to the benefit of, or be distributed to its participants, directors, officers, or other private persons, except that the Corporation shall be authorized and empowered to pay any reasonable compensation for services rendered and to make payments and distributions in furtherance of the exempt purposes set forth herein. No substantial part of the activities of the Corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation, and the Corporation shall not participate in, or intervene in (including the publishing or distribution of statements) any political campaign on behalf of or in opposition to any candidate for public office. Notwithstanding any other provision of these Bylaws, the Corporation shall not carry on any other activities not

permitted to be carried on (a) by an organization exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code, or the corresponding section of any future federal tax code, or (b) by an organization, contributions to which are deductible under section 170(c)(2) of the Internal Revenue Code, or the corresponding section of any future federal tax code.

## ARTICLE X

### DISSOLUTION

Upon dissolution of the Corporation, all assets shall be distributed for one or more exempt purposes within the meaning of section 501(c)(3) of the Internal Revenue Code, or corresponding section of any future federal tax code, or shall be distributed to the federal government, or to a state or local government for a public purpose. Any such assets not so disposed of shall be disposed of by a court of competent jurisdiction of the county in which the principal office of the Corporation is then located, exclusively for such purposes or to such organization or organizations, as said court shall determine, which are organized and operated exclusively for such purposes.

These Bylaws were adopted on June 28, 2018.

I, the undersigned Chairman of the Corporation, do hereby certify that the above Bylaws were duly adopted by the Corporation on the date set forth above.

_____          6-28-18
                                          _____
Chairman Signature                        Date

7

# Conflict of Interest Policy

# CONFLICT OF INTEREST POLICY
## FOR TRINITY HEALTHSHARE, INC.

### ARTICLE I
### PURPOSE

The purpose of this conflict of interest policy is to ensure that the officers and directors of Trinity Healthshare, Inc. do not use poor business judgment, engage in self-dealing, or attempt to receive excessive benefits based on their private interests in transactions or contemplated transactions of Trinity Healthshare, Inc. This policy is intended as a supplement to applicable state and federal laws governing conflicts of interest.

### ARTICLE II
### DEFINITIONS

**1.    Interested Person**

Any officer, director, or individual with board-delegated power, who has a direct or indirect financial interest, as defined below, is an interested person.

**2.    Financial Interest**

A person has a financial interest if the person has, directly or indirectly, through business, investment, or family:

    **a.**  An ownership or investment interest in any entity with which the Corporation has a transaction or arrangement,

    **b.**  A compensation arrangement with the Corporation or with any entity or individual with which the Corporation has a transaction or arrangement, or

    **c.**  A potential ownership or investment interest in, or compensation arrangement with, any entity or individual with which the Corporation is negotiating a transaction or arrangement.

Compensation includes direct and indirect remuneration as well as gifts or favors that are not insubstantial.

A financial interest is not necessarily a conflict of interest. Under Article III, Section 2, a person who has a financial interest may have a conflict of interest only if the appropriate governing board or committee decides that a conflict of interest exists.

### ARTICLE III
### PROCEDURES

**1.    Duty to Disclose**

An interested person must disclose the existence of any financial interest that poses an actual or possible conflict of interest. The interested person must be given the opportunity to disclose all material facts to the Board of Directors.

**2.    Determining Whether a Conflict of Interest Exists**

After the interested person has disclosed the financial interest that poses an actual or possible conflict of interest to the Board of Directors, along with all material facts, and

after any discussion with the interested person has occurred, the interested person shall leave the board meeting while the remaining board members discuss the conflict of interest and hold a vote. The remaining board members shall decide whether a conflict of interest exists and vote on whether the Corporation should proceed with the contemplated transaction.

3.  **Procedures for Addressing the Conflict of Interest**
    a.  An interested person may make a presentation to the Board of Directors and discuss the conflict with the Board of Directors.
    b.  After any such presentation and discussion, the interested person shall leave the Board meeting during further discussion and voting on the conflict of interest.
    c.  Disinterested directors may appoint a disinterested third party or committee to investigate alternative options.
    d.  After exercising due diligence, the disinterested directors shall determine whether the Corporation can obtain with reasonable efforts a more advantageous transaction for the Corporation from a disinterested party.
    e.  If a more advantageous transaction is not determined to be reasonably possible, the disinterested directors shall determine, by majority vote, whether the transaction is fair and reasonable and in the best interests of the Corporation. If the transaction is determined to be fair and reasonable and in the best interests of the Corporation, the disinterested directors may then elect, by majority vote, to enter into the transaction with the interested person.

4.  **Violations of the Conflicts of Interest Policy**
    a.  If the Board of Directors has reason to believe that an interested person has failed to disclose an actual or possible conflict of interest, it shall inform the interested member of the basis for such belief and afford the member an opportunity to explain the alleged failure to disclose.
    b.  If the Board of Directors determines the interested member has failed to disclose an actual or possible conflict of interest, it shall take appropriate corrective action.

## ARTICLE IV
### RECORDS OF PROCEEDINGS

The minutes of the Board of Directors and all committees with board delegated powers shall contain:
    a.  The names of the persons who disclosed or otherwise were found to have a financial interest in connection with an actual or possible conflict of interest, the nature of the financial interest, any action taken to determine whether a conflict of interest was present, and the governing board's or committee's decision as to whether a conflict of interest in fact existed.
    b.  The names of the persons who were present for discussion and votes relating to the transaction or arrangement, the content of the discussion, including

2

any alternatives to the proposed transaction or arrangement, and a record of any votes taken in connection with the proceedings.

## ARTICLE V
### COMPENSATION

A member of the Board of Directors who receives compensation, directly or indirectly, from the Corporation for services is precluded from voting on matters pertaining to that member's compensation.

## ARTICLE VI
### ANNUAL STATEMENTS

Each director, principal officer and member of a committee with governing board delegated powers shall annually sign a statement which affirms such person:

    a.  Has received a copy of the conflicts of interest policy,
    b.  Has read and understands the policy,
    c.  Has agreed to comply with the policy, and
    d.  Understands that the corporation is charitable and in order to maintain its federal tax exemption it must engage primarily in activities which accomplish one or more of its tax-exempt purposes.

## ARTICLE VII
### PERIODIC REVIEWS

To ensure the Corporation operates in a manner consistent with charitable purposes and does not engage in activities that could jeopardize its tax-exempt status, periodic reviews shall be conducted. The periodic reviews shall, at a minimum, include the following subjects:

    a.  Whether compensation arrangements and benefits are reasonable, based on competent survey information, and the result of arm's length bargaining,
    b.  Whether partnerships, joint ventures, and arrangements with management organizations conform to the Corporation's written policies, are properly recorded, reflect reasonable investment or payments for goods and services, further charitable purposes and do not result in self-dealing, impermissible private benefit or an excess benefit transaction.

## ARTICLE VIII
### USE OF OUTSIDE ADVISORS

When conducting the periodic reviews as provided for in Article VII, the Corporation is permitted to use outside advisors. If outside advisors are used, their use shall not relieve the governing board of its responsibility for ensuring periodic reviews are conducted.

3

## CERTIFICATE OF ADOPTION OF CONFLICT OF INTEREST
## POLICY AND AGREEMENT

I do hereby certify that the above stated Conflict of Interest Policy and Agreement for Trinity Healthshare, Inc. were approved and adopted by board of directors on Thursday, June 28, 2018 and constitute a complete copy of the Conflict of Interest Policy of the corporation.

Chairman _____

Date ___6-28-18_____

8

# EIN Confirmation



DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
CINCINNATI  OH   45999-0023

Date of this notice:  06-27-2018

Employer Identification Number:
83-1050344

Form:  SS-4

Number of this notice:  CP 575 A

TRINITY HEALTHSHARE INC
% WILLIAM H THEAD III
860 JOHNSON FERRY ROAD STE 140-106
ATLANTA, GA  30342

For assistance you may call us at:
1-800-829-4933

IF YOU WRITE, ATTACH THE
STUB AT THE END OF THIS NOTICE.


WE ASSIGNED YOU AN EMPLOYER IDENTIFICATION NUMBER

     Thank you for applying for an Employer Identification Number (EIN).  We assigned you
EIN 83-1050344.  This EIN will identify you, your business accounts, tax returns, and
documents, even if you have no employees.  Please keep this notice in your permanent
records.

     When filing tax documents, payments, and related correspondence, it is very important
that you use your EIN and complete name and address exactly as shown above.  Any variation
may cause a delay in processing, result in incorrect information in your account, or even
cause you to be assigned more than one EIN.  If the information is not correct as shown
above, please make the correction using the attached tear off stub and return it to us.

     Based on the information received from you or your representative, you must file
the following form(s) by the date(s) shown.

               Form 941                     10/31/2018
               Form 940                     01/31/2019

     If you have questions about the form(s) or the due date(s) shown, you can call us at
the phone number or write to us at the address shown at the top of this notice.  If you
need help in determining your annual accounting period (tax year), see Publication 538,
*Accounting Periods and Methods.*

     We assigned you a tax classification based on information obtained from you or your
representative.  It is not a legal determination of your tax classification, and is not
binding on the IRS.  If you want a legal determination of your tax classification, you may
request a private letter ruling from the IRS under the guidelines in Revenue Procedure
2004-1, 2004-1 I.R.B. 1 (or superseding Revenue Procedure for the year at issue).  Note:
Certain tax classification elections can be requested by filing Form 8832, *Entity
Classification Election.*  See Form 8832 and its instructions for additional information.

     If you are required to deposit for employment taxes (Forms 941, 943, 940, 944, 945,
CT-1, or 1042), excise taxes (Form 720), or income taxes (Form 1120), you will receive a
Welcome Package shortly, which includes instructions for making your deposits
electronically through the Electronic Federal Tax Payment System (EFTPS).  A Personal
Identification Number (PIN) for EFTPS will also be sent to you under separate cover.
Please activate the PIN once you receive it, even if you have requested the services of a
tax professional or representative.  For more information about EFTPS, refer to
Publication 966, *Electronic Choices to Pay All Your Federal Taxes.*  If you need to
make a deposit immediately, you will need to make arrangements with your Financial
Institution to complete a wire transfer.

(IRS USE ONLY)    575A              06-27-2018  TRIN  B  9999999999  SS-4

The IRS is committed to helping all taxpayers comply with their tax filing obligations.  If you need help completing your returns or meeting your tax obligations, Authorized e-file Providers, such as Reporting Agents (payroll service providers) are available to assist you.  Visit the IRS Web site at www.irs.gov for a list of companies that offer IRS e-file for business products and services.  The list provides addresses, telephone numbers, and links to their Web sites.

To obtain tax forms and publications, including those referenced in this notice, visit our Web site at www.irs.gov.  If you do not have access to the Internet, call 1-800-829-3676 (TTY/TDD 1-800-829-4059) or visit your local IRS office.

**IMPORTANT REMINDERS:**

* Keep a copy of this notice in your permanent records.  **This notice is issued only one time and the IRS will not be able to generate a duplicate copy for you.**  You may give a copy of this document to anyone asking for proof of your EIN.

* Use this EIN and your name exactly as they appear at the top of this notice on all your federal tax forms.

* Refer to this EIN on your tax-related correspondence and documents.

If you have questions about your EIN, you can call us at the phone number or write to us at the address shown at the top of this notice.  If you write, please tear off the stub at the bottom of this notice and send it along with your letter.  If you do not need to write us, do not complete and return the stub.

Your name control associated with this EIN is TRIN.  You will need to provide this information, along with your EIN, if you file your returns electronically.

Thank you for your cooperation.

                              Keep this part for your records.        CP 575 A (Rev. 7-2007)

------------------------------------------------------------------------------------------

Return this part with any correspondence
so we may identify your account.  Please                        CP 575 A
correct any errors in your name or address.
                                                                9999999999

Your Telephone Number  Best Time to Call  DATE OF THIS NOTICE:  06-27-2018
(     )      -                            EMPLOYER IDENTIFICATION NUMBER:  83-1050344
_____  _____      FORM:  SS-4            NOBOD


INTERNAL REVENUE SERVICE                  TRINITY HEALTHSHARE INC
CINCINNATI  OH   45999-0023               % WILLIAM H THEAD III
ԼլԱԼԼԼԼԼԼԼԼԼԼԼԼԼԼԼԼԼԼԼԼ                    860 JOHNSON FERRY ROAD STE 140-106
                                          ATLANTA, GA  30342

**WALZ CERTIFIED MAILER®**

FROM **WALZ**

FORM #45663NB VERSION: E0517

**U.S. Postal Service®**
**CERTIFIED MAIL® RECEIPT**
Domestic Mail Only

USPS® ARTICLE NUMBER

9314 8699 0430 0048 2346 07

**Label #1**

Internal Revenue Service
Attn: EO Determination Letters
Stop 31
Post Office Box 12192
Covington, KY 41012-0192

| | | |
|---|---|---|
| Certified Mail Fee | $ | 3.45 |
| Return Receipt (Hardcopy) | $ | 0.00 |
| Return Receipt (Electronic) | $ | 1.50 |
| Certified Mail Restricted Delivery | $ | 0.00 |
| Postage | $ | 2.05 |
| Total Postage and Fees | $ | 7.00 |

Postmark Here

Sent to:
Internal Revenue Service
Attn: EO Determination Letters
Stop 31
Post Office Box 12192
Covington, KY 41012-0192

**Label #2**

Jennifer M. Moseley
Burr Forman, LLP
171 17th Street, NW, Suite 1100
Suite 1100
Atlanta, GA 30363

**Reference Information**

**Label #3**

Jennifer M. Moseley
Burr Forman, LLP
171 17th Street, NW, Suite 1100
Suite 1100
Atlanta, GA 30363

← TEAR ALONG THIS LINE

PS Form 3800, Facsimile, July 2015

**A** FOLD AND TEAR THIS WAY → OPTIONAL

**B**

Label #4 — Certified Article Number — SENDER'S RECORD
9314 8699 0430 0048 2346 07

**Label #5 (Optional)**

Internal Revenue Service
Attn: EO Determination Letters
Stop 31
Post Office Box 12192
Covington, KY 41012-0192

**Label #6 - Return Receipt Article Number**

**Label #7 - Certified Mail Article Number**

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS. FOLD AT DOTTED LINE

**CERTIFIED MAIL®**

9314 8699 0430 0048 2346 07

RETURN RECEIPT (ELECTRONIC)

Label #8

PLACE ON BACK OF RETURN RECEIPT **(REQUIRED)** →

**C** FOLD AND TEAR THIS WAY →

Thank you for using Return Receipt Service

RETURN RECEIPT REQUESTED
USPS® MAIL CARRIER
DETACH ALONG PERFORATION

Return Receipt (Form 3811) Barcode

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X
☐ Agent
☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

1. Article Addressed to:

# Please Discard

☐ Certified Mail
☐ Certified Mail Restricted Delivery

**Reference Information**

2. Certified Mail (Form 3800) Article Number

Thank you for using Return Receipt Service

# Exhibit 2

**Creeley, Brandy**

---

| | |
|---|---|
| **From:** | Moseley, Jennifer |
| **Sent:** | Thursday, July 26, 2018 11:51 AM |
| **To:** | ript09@hotmail.com |
| **Subject:** | Trinity Healthshare Engagement Letter |
| **Attachments:** | Doc#_32132649_v_1_Trinity HealthShare, Inc. - Engagement Letter.2018.7.26.PDF; ATT00001.txt |

Mr. Thead,

I apologize for introducing myself to you first by email, but Tim and Shelley are traveling and I can't seem to track down a phone number for you. As you are aware, my firm filed the Form 1023 with the IRS on behalf of Trinity, and I understand from Tim that I was to engage directly with Trinity for this and that Trinity would bear the expenses.

To that end, please find the attached engagement letter for our services. Please note that since Aliera is an ongoing client of the firm, and we will be representing Aliera in the drafting and negotiation of the agreement between Trinity and Aliera, I've included a conflict waiver in the attached letter. If you have any questions or concerns about this, please do not hesitate to give me a call.

If you have no questions, please sign and return the attached letter by email at your earliest convenience.

I look forward to speaking with you soon.

Best regards,
Jennifer

Jennifer M. Moseley - Partner
Burr & Forman LLP
171 17th Street NW
Suite 1100
Atlanta, Georgia 30363
direct 404-685-4322 - fax 404-214-7389 - main 205-251-3000 jmoseley@burr.com - www.burr.com

AL - DE - FL - GA - MS - NC - TN

---

The information contained in this email is intended for the individual or entity above.
If you are not the intended recipient, please do not read, copy, use, forward or disclose this communication to others; also, please notify the sender by replying to this message, and then delete this message from your system. Thank you.

# Exhibit 3



*results matter*

Jennifer M. Moseley
Direct Dial: (404) 685-4322
Direct Fax: (404) 214-7389
Email: jmoseley@burr.com

171 Seventeenth Street, NW
SUITE 1100
Atlanta, GA 30363

*Office* (404) 815-3000
*Fax* (404) 817-3244
*Toll-free* (877) FOR-BURR

BURR.COM

July 26, 2018

**VIA EMAIL: RIPT09@HOTMAIL.COM**

Trinity HealthShare, Inc.
Attn: William H. Thead, III, Chairman - Director
860 Johnson Ferry Road
Suite 140-106
Atlanta, Georgia 30342

Dear Mr. Thead:

This letter confirms your engagement of Burr & Forman LLP for services as your legal counsel regarding the formation of Trinity HealthShare, Inc. and the preparation of the Form 1023 and the adjudication of the same with the IRS. You have retained us only for the limited purpose of the Form 1023, and you and we understand that we will provide no other legal services to Trinity HealthShare.

Although we do not wish to be overly formal in our relationship, we have found it helpful in our practice to confirm with clients the nature and terms of our representation. Our representation will be deemed effective as of June 26, 2018 upon your acceptance of this engagement letter. Our engagement may be terminated by either of us subject to payment of all fees and expenses incurred through date of termination.

Our fees are based upon traditional factors governing establishment of attorneys' fees (i.e., time and skill required, novelty and difficulty of the questions involved, amount involved and results obtained). For billing efficiency, we have assigned each of our lawyers an hourly rate, based upon his or her ability, experience and reputation. Hourly rates are based upon the particular lawyers performing services for you, and will be the dominant element in the determination of your fees. We will of course, when appropriate, involve other individuals in order to accomplish your work at the lowest appropriate rate.

We will bill you monthly for legal services rendered and out of pocket costs incurred by us on your behalf during the immediately preceding month. Out of pocket costs generally include the following: travel expenses; long distance telephone calls; cost of terminal time for computer research; courier fees; filing; recording, certification and registration fees charged by governmental bodies; and the cost of photocopy material. Secretarial overtime, if required by the client, is charged at a flat rate of thirty dollars per hour. Statements will be rendered monthly and will include a description of services provided and expenses advanced in the previous month and will be due upon receipt.

In addition, you are aware that the firm represents Aliera Healthcare, Inc. and you understand and agree that the firm will continue to represent Aliera, even in connection with any business arrangements or

Trinity Healthshare, Inc.
July 26, 2018
Page 2

agreements between Trinity HealthShare and Aliera. By signing this engagement letter, you are agreeing to waive any conflicts that may arise as a result of this firm's representation of Aliera in matters related to Trinity, even if the matter is directly adverse to you. We agree that your prospective consent to conflicting representation reflected in the preceding sentence shall not apply in any instance where, as a result of our representation of you in connection with the Form 1023, we have obtained sensitive, proprietary or otherwise confidential information that, if known to Aliera, could be used in any such other matter by Aliera to your material disadvantage.

If the foregoing meets with your approval, please indicate your acceptance by signing this letter in the space provided below. Please return a scanned, signed copy to me via email and retain a copy for your records. We certainly appreciate the opportunity to work with you and look forward to a mutually satisfactory relationship.

Very truly yours,

Jennifer M. Moseley

**ACCEPTED BY:**

**Trinity HealthShare, Inc.**

By: _____

Name: __William H. Thead, III__

Title: __Chairman – Director__

Date: __7-26-18__

**Exhibit 4**

## MANAGEMENT AND ADMINISTRATION AGREEMENT

This Management and Administration Agreement (the "**Agreement**") is effective as of August 13, 2018 (the ("**Effective Date**") by and between Aliera Healthcare, Inc., a Delaware corporation ("**Aliera**"), and Trinity HealthShare, Inc., a Delaware nonprofit corporation ("Trinity"). Aliera and Trinity are sometimes referred to collectively as the "**Parties**," and each individually as a "**Party**".

**WHEREAS**, Aliera develops and markets healthcare products as an alternative to traditional health insurance, with some products containing a health care sharing ministry component;

**WHEREAS**, Aliera is a program manager for health care sharing ministry plans, responsible for the development of plan designs, pricing, and marketing materials, vendor management, and recruitment and maintenance of a national sales force to market plans, including accounting and management of sales commissions to authorized marketing representatives on behalf of the ministry;

**WHEREAS**, Aliera also provides administrative services that include system administration for both membership processing systems and member ShareBox databases, enrollment processing, billing and collection of monthly share amounts from health care sharing members, maintenance of membership records, management of third party administrators responsible for the processing of medical claims forms and determining sharing eligibility, and issuance of payment to members and providers, as well as providing and maintaining an inbound call center for member services, website development and maintenance, and usual and customary management functions such as Finance, Compliance, Human Resources, Marketing, Privacy, Data Security, and Information Technology;

**WHEREAS**, Trinity has filed the Form 1023 with the Internal Revenue Service (the "**IRS**") for recognition of exemption from federal income tax under section 501(c)(3) of the Internal Revenue Code, and wishes to enter into this Agreement allowing Aliera to include Trinity's healthcare sharing ministry program (the "**HCSM**") as a component of an existing healthcare plan which Aliera offers, or as a new healthcare plan which Aliera will offer, to the general public (any plan containing or consisting of the HCSM, a "**Plan**"), which Plans are listed on **Exhibit A** (as may be amended from time to time);

**WHEREAS**, Aliera has the exclusive right to design, market and sell the HCSM to its existing members and prospective members and to provide enrollment and other administrative services relating to the HCSM, and to market the Plans, which Plans will not include insurance products and cannot be bundled with insurance;

**WHEREAS**, Trinity currently has no members in its HCSM, and the Parties intend that the members who enroll in the Plans become "customers" of Aliera, and that Aliera maintain ownership over the "**Membership Roster**," which shall include the name, contact information, social security number, type of Plan and agent information (if applicable), among other necessary information, for each member who enrolls in the Plans.

#1058.1

NOW, **THEREFORE**, in consideration of the foregoing and the mutual promises and conditions contained herein, the Parties agree as follows:

1. **Description of Services; Rights and Duties**

    a. <u>Exclusive Rights</u>. Trinity grants to Aliera an exclusive license to develop, market and sell the HCSM plans to individuals in the public markets who will acknowledge the standard of beliefs and other requirements as deemed necessary by Trinity, and agreed upon by Aliera. Aliera has the right to use all distribution channels for such marketing and sales; provided, however, that Aliera shall not permit brokers, field agents, general agencies or call centers to combine any insurance products with the HCSM.

    b. <u>Product Development</u>. Aliera will be responsible for plan design (defining the schedule of medical services eligible for sharing), and pricing of the Plans. Aliera has the right, at its sole discretion, to develop and market the HCSM (the schedule of medical services eligible for sharing under the HCSM) with other non-insurance health care products that are developed and managed by Aliera as an "**Aliera Product**" and included in the same Plan. Aliera also has the sole right and discretion to determine whether a Plan also includes one or more Aliera Products.

    c. <u>Marketing</u>. Aliera will (i) create any and all marketing materials used to market the Plans pursuant to this Agreement, and (ii) market and sell, through its authorized representatives, the Plans (the "**Services**"). Trinity authorizes Aliera and its authorized marketing representatives to discuss with potential members the prices, terms and conditions for the HCSM, and to provide explanations of the HCSM. Aliera, and its authorized marketing representatives will provide information to potential members regarding the faith and lifestyle requirements for the HCSM, as well as information necessary for potential members to understand that the Plans are not insurance.

    d. <u>Enrollment; Acceptance of Subscriptions of Members; Ownership of Membership Roster</u>. Aliera (or its representatives or agents) will enroll new members in the Plans. Aliera is authorized to accept any enrollment from members in the Plans in its sole discretion. Aliera acknowledges and understands that, in order for members to qualify for participation in a healthcare sharing ministry, Aliera may only accept subscriptions from members who will acknowledge the standard of beliefs and other requirements as deemed necessary by Trinity and agreed upon by Aliera. Trinity acknowledges and agrees that, because Aliera is the sole party developing and marketing the Plans (including the HCSM component) and making the sole effort to develop members, Aliera has exclusive ownership rights to the Membership Roster, and Trinity is not authorized to contact any members or use any information contained in the Membership Roster for any purpose without the prior written consent of Aliera.

    e. <u>Changes by Members</u>. Members who are enrolled in any Plan are permitted to change components of Plans as directed by Aliera. Aliera is authorized, in its sole discretion, to transfer members to different Plans if members request such change in writing, and may substitute any component of a Plan, including the HCSM, upon notice to the members of any Plan. Aliera will notify Trinity when it has made a substitution of the HCSM component of a Plan at a member's request.

**#1058.2**

f.    <u>Medical Expense Processing</u>.  Aliera will enter into a third party administrative services agreement with a third party administrator, which may be an affiliate of Aliera (the "**TPA**"), pursuant to which the TPA provides account management and medical expense processing services for the Plans, as specifically described in such agreement.  So long as such agreement or other similar agreement is in effect, Aliera shall have no obligation to provide account management and medical expense processing services for the HCSM.  In addition, Aliera may engage other third party administrative service providers in connection with the Plans or this Agreement.  In addition, Aliera may direct the TPA to use the services of other providers or service providers in order to enhance members' experiences, contain costs, or provide services that the TPA may not be qualified to provide.

g.    <u>Medical Expense Funding</u>.  Aliera and Trinity agree that each Party will distribute amounts to the ShareBox account for members to fund future member medical expense payments in accordance with **Exhibit B** attached hereto.  The Parties may amend **Exhibit B** without amending this Agreement.

h.    <u>Financial Reporting</u>.  Trinity is responsible for providing and paying for accounting staff to support the financial operations necessary for the HCSM.  Trinity hereby delegates this responsibility to Aliera, and Aliera agrees to provide such accounting staff and financial operations support, including monthly financial and membership reporting, audit support and Form 990 tax filing support as part of the Services.

i.    <u>Tax Filings; Audits</u>.  The Parties agree to have simultaneous Audits performed by the same mutually agreed upon audit firm for each calendar year end.  This cooperation to engage certified public accountants and auditors is specifically encouraged to timely prepare and file Trinity's Form 990s and perform required audits relating to the HCSM, as required (including required time frames) under IRS rules applicable to 501(c)(3) organizations and health care sharing ministries.  Each Party is responsible for its own expenses in connection with any tax filings or audits.  Each Party shall make available to the certified public accountants and auditors, upon reasonable and advance request, all books and records required to be reviewed in connection with any tax filings or audits.

j.    <u>Compliance with Non-Profit Laws</u>.  Trinity has the sole responsibility to determine the requirements applicable to it as a non-profit organization.

k.    <u>Trinity Board</u>.  The board of directors of Trinity shall be selected by Trinity.  At all times during the Term of this Agreement, no more than one-third of the board of directors of Trinity will consist of directors who are current directors, officers, employees, agents or stockholders of Aliera.  Trinity has the sole responsibility and obligation to determine when board actions are required, and Aliera has no responsibility to assist or advise Trinity regarding any of its internal governance matters.  Notwithstanding the foregoing, the Trinity board shall not take any actions that will cause it to violate this Agreement, Aliera's rights under this Agreement, or negatively affect the interests of the members of the Membership Roster.

**#1058.3**

2.    **Intellectual Property**

a.    <u>License of Trinity Name</u>.  Trinity hereby grants to Aliera a non-exclusive, non-transferable, and non-sublicensable license to use Trinity's trademarks, logos, and other brand indicia (collectively, "**Brand Indicia**") of Trinity (the "**Trinity Marks**") during the Term, on or in connection with the marketing, promotion, advertising, and sale of the Plans. Upon reasonable written request from Trinity, Aliera will discontinue the display or use of the Trinity Marks or change the manner in which one or more Trinity Marks are displayed or used, provided that Aliera shall have no obligation to destroy existing inventory of materials as a result of a change in the Trinity Marks, but only to replace such inventory with the revised versions of the Trinity Marks when such inventory is depleted. Aliera acknowledges and agrees that any and all goodwill arising as a result of Aliera's use of the Trinity Marks shall inure to the benefit of Trinity, and Aliera acquires no rights in or to the Trinity Marks other than the license specifically set forth in this Agreement. Trinity shall not have a right or license to use the Aliera Brand Indicia.

b.    <u>Intellectual Property Defined</u>.  "**Intellectual Property**" means any and all methods, processes, procedures, inventions (regardless of patentability), ideas, designs, concepts, technique, discoveries, improvements, software code, algorithms, works of authorship, work product or moral rights, as well as any trademarks, service marks, copyrights, copyright applications, rights in copyrightable works, trade secrets, know-how and other confidential or proprietary information, patents, patent applications, any divisionals, continuations, continuations-in-part, reissues, extensions, or reexaminations thereof, and any other intellectual property rights or other proprietary rights in any country or jurisdiction throughout the world.

c.    <u>Background Intellectual Property</u>.  "**Background IP**" means any Intellectual Property conceived, developed, created or discovered prior to or outside the scope of this Agreement.

d.    <u>Trinity Intellectual Property</u>.  Subject only to the rights expressly granted in this Agreement, Trinity owns and shall retain ownership of all Trinity Background IP.  In addition, subject only to the rights and licenses expressly granted in this Agreement, Trinity will solely own all right, title and interest in any Intellectual Property conceived, developed, created or discovered solely by Trinity personnel or contractors in the performance of this Agreement (the "**Trinity Intellectual Property**").

e.    <u>Aliera Intellectual Property</u>.  Subject only to the rights expressly granted in this Agreement, Aliera owns and shall retain ownership of all Aliera Background IP.  In addition, subject only to the rights and license granted in this Agreement, Aliera will solely own all right, title and interest in any Intellectual Property conceived, developed, created or discovered solely by Aliera personnel or contractors in the performance of this Agreement (the "**Aliera Intellectual Property**").  Without limiting the foregoing, Aliera Intellectual Property shall specifically include all plan designs, marketing materials, plan concepts, pricing structure, the Membership Roster, software systems to manage said plans and all Intellectual Property associated with the plans designed and implemented by Aliera, even if said items bear the Brand Indicia or Trinity Marks. Neither the use of the Brand Indicia nor the Trinity Marks in the Aliera Background IP or the Aliera Intellectual Property will grant Trinity any rights in or to the Aliera Background IP or the

**#1058.4**

Aliera Intellectual Property other than the ownership in and to the Brand Indicia and the Trinity Marks that Trinity holds as Trinity Background IP.

       f.     <u>Joint Intellectual Property</u>.  Trinity and Aliera will jointly own any and all Intellectual Property conceived, developed, created or discovered jointly by personnel or contractors of both Trinity and Aliera (the "**Joint Intellectual Property**").  Aliera and Trinity will coordinate with each other to determine whether it is appropriate to file for any intellectual property protections for the Jointly Developed Intellectual Property, and both Aliera and Trinity will each have the right to exploit the Jointly Intellectual Property without accounting to the other, provided that such exploitation does not violate other provisions of this Agreement.

       g.     <u>No Other Licenses</u>.  For the avoidance of doubt, other than the express licenses granted by this Agreement, none of the Parties grant any rights or licenses to their Intellectual Property, by implication, estoppel, or otherwise, to the other Parties.

**3.**     **<u>Revenue and Expenses; Payments</u>**

       a.     <u>Revenues and Expenses</u>. Trinity and Aliera have agreed to apportion the total revenues received from the member share contribution amounts and the vendor fees associated with the Plans in accordance with **<u>Exhibit B</u>** attached hereto, which may be amended from time to time as agreed to by the Parties (the "**Revenue and Expense Structure**").  For clarity, the Parties may amend the Revenue and Expense Structure by amending **<u>Exhibit B</u>** only, without amending this Agreement.  No person who is a "disqualified person" under IRS rules and regulations will be paid any fees by the other Party.

       b.     <u>Enrollment Fees</u>.  Trinity will receive $25 for each application to be paid from each member's enrollment fees (the "**Member Enrollment Fees**") in any of the Plans.

       c.     <u>Member Payments</u>.  All member share contributions (the monthly share amount that each member contributes for each of the Plans) and Member Enrollment Fees will be first paid directly to a banking account in the name of Aliera.  Aliera will transfer the funds attributable to the HCSM portion of the Plans into a banking account in the name of Trinity, which funds will be the net amount after any payments due from Trinity, in accordance with the Revenue and Expense Structure and the Share Box Contribution, have been distributed by Aliera.  Aliera will provide Trinity with a report within 15 days of the end of each month showing the amounts attributable in that month to the HCSM portion of the Plans, and the deductions made from such amounts in accordance with the Revenue and Expense Structure.

       d.     <u>Payments</u>.  Pursuant to resolutions of the board of directors of Trinity, Aliera is an authorized signatory, and is authorized to make payments from, each and all banking accounts opened in Trinity's name in connection with this Agreement.  Aliera is authorized to make, or cause to be made, deposits into, and payments from, such Trinity banking accounts, in accordance with the Revenue and Expense Structure.

**#1058.5**

4.     **Representations and Warranties**

Each Party represents and warrants to the other that (i) it has the full authority and power to enter into and fully perform this Agreement; (ii) neither the execution nor delivery of this Agreement, nor such Party's performance of any obligations under this Agreement, will conflict with or violate any other license, agreement or commitment by which such Party is bound; and (iii) it will perform its obligations under this Agreement in compliance with all applicable laws and regulations.

5.     **Termination**

a.     Term.  This Agreement shall become effective on the Effective Date and shall continue in force until the fifth (5th) anniversary of the Effective Date (the "**Initial Term**"), and will automatically, without further action by either Party, renew for an additional five (5) years ("**Renewal Term**", and each Renewal Term together with the Initial Term, the "**Term**"), unless either Party delivers to the other Party written notice of its intent not to renew at least 270 days prior to the expiration of the Initial Term or the then current Renewal Term, as applicable.

b.     Termination Upon Default.  Either Party may terminate this Agreement, effective on written notice to the other party (the "**Defaulting Party**"), if the Defaulting Party:

i.     Materially breaches this Agreement, and either such material breach is incapable of cure or, if curable, the Defaulting Party does not cure such breach within 30 days after receipt of written notice of such breach;

ii.     Becomes insolvent or admits its inability to pay its debts generally as they become due, makes a general assignment for the benefit of creditors, voluntarily enters into an proceeding under any bankruptcy or insolvency law, becomes involuntarily subject to any such proceeding which is not dismissed or vacated within 45 days after filing, or has a receiver or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business; or

iii.     Is dissolved or liquidated or takes any corporate action for such purpose.

c.     Post-Termination Matters.  Neither Party shall incur any liability to the other by reason of the termination of this Agreement or its non-renewal; provided, however, that the termination of this Agreement for any reason shall not terminate any rights, obligations or liabilities which either Party may accrue prior to such expiration or termination.  Upon valid termination of this Agreement, all rights and authority granted hereunder shall immediately terminate (except as provided below), and the Parties will promptly destroy or return all materials in its possession which belong to the other Party, including any and all confidential information which may have come into its possession as well as any and all materials bearing the Brand Indicia or containing the Intellectual Property of the other Parties. In the event of any termination of this Agreement, Sections 1(d), 7, 8 and 9 will survive in accordance with their terms.

#1058.6

    d.    <u>Active Members</u>.  Upon termination of this Agreement in accordance with this Section, any existing member enrolled in a Plan will remain active and continue to be serviced by Aliera until the member requests cancellation of the Plan.

**6.**    **Indemnification & Limitations**

    a.    <u>Indemnification</u>. Each party shall agree to defend, hold harmless and expeditiously indemnify the other party of and from any and all liability, claim, loss, damage, or expense arising from or in connection with the indemnifying Party's breach or violation of any representation, warranty or covenant contained in this Agreement (if such breach of representation, warranty or covenant is decided by a court of competent jurisdiction, arbitration or by admission of either party), including reasonable attorneys' fees and expert witness fees and other reasonable costs incurred in the defense of any legal proceeding asserting such a claim.

    b.    <u>Limitations</u>.    EXCEPT FOR (i) A PARTY'S BREACH OF ITS CONFIDENTIALITY AND NON-SOLICITATION OBLIGATIONS SET FORTH IN SECTION 7 AND (ii) A PARTY'S INDEMNITY OBLIGATIONS SET FORTH IN SECTION 6, NEITHER PARTY WILL BE LIABLE TO THE OTHER PARTY FOR ANY INCIDENTAL, CONSEQUENTIAL, SPECIAL, OR PUNITIVE DAMAGES ARISING OUT OF THIS AGREEMENT, WHETHER LIABILITY IS ASSERTED IN CONTRACT OR TORT, AND REGARDLESS OF WHETHER EITHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF ANY SUCH LOSS OR DAMAGE THIS SECTION DOES NOT LIMIT EITHER PARTY'S LIABILITY FOR BODILY INJURY (INCLUDING DEATH), OR PHYSICAL DAMAGE TO TANGIBLE PROPERTY. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, EXCEPT AS PROVIDED FOR A BREACH OF SECTION 7 (CONFIDENTIALITY AND NON-SOLICITATION OBLIGATIONS) OR EXCEPT AS PROVIDED UNDER SECTION 6 (INDEMNITY OBLIGATIONS), IN NO EVENT SHALL EITHER PARTY'S TOTAL LIABILITY TO THE OTHER PARTY IN CONNECTION WITH, ARISING OUT OF OR RELATING TO THIS AGREEMENT EXCEED $5,000 (USD). THE PARTIES AGREE THAT THE LIMITATION SPECIFIED IN THIS SECTION WILL APPLY EVEN IF ANY LIMITED REMEDY PROVIDED IN THIS AGREEMENT IS FOUND TO HAVE FAILED OF ITS ESSENTIAL PURPOSE.

**7.**    **Confidential Information; Non-Solicitation**

    a.    <u>Confidential Information</u>.

    i.    <u>Definition</u>.  From time to time during the Term of this Agreement, either Party (in such capacity, the "**Disclosing Party**") may, but is not hereby obligated to, disclose or make available to the other Party (in such capacity, the "**Receiving Party**") proprietary information of the Disclosing Party, including information about its business, products and services, ownership structure, financial condition, operations, assets, liabilities, business plans, Aliera Intellectual Property, information that it deems a trade secret under applicable law, third-party confidential information in the Disclosing Party's possession or under its control, and other sensitive or proprietary information, and all notes, documents and other materials prepared by the Receiving Party that contain, reflect or are based upon any such information described above, in each case whether orally or in

**#1058.7**

writing, electronic or other form or media, and whether or not marked, designated or otherwise identified as "confidential" (collectively, "**Confidential Information**").

ii.    Exclusions.  Confidential Information shall not include information that, at the time of disclosure and as established by the Receiving Party by documentary evidence: (i) was already possessed by the Receiving Party prior to its being obtained in connection with the Services, free of other confidentiality obligations to the Disclosing Party, (ii) has become generally available to the public other than as a result of disclosure by the Receiving Party or any of its affiliates or representatives, or (iii) has become available to the Receiving Party on a non-confidential basis from a source other than the Disclosing Party, where the Receiving Party has no knowledge, after reasonable inquiry, that the source owes any confidentiality obligation to the Disclosing Party.

iii.    HIPAA.  Trinity acknowledges that Aliera may determine, with advice of counsel, that Aliera is subject to (i) the Health Insurance Portability and Accountability Act of 1996, and regulations promulgated thereunder, including the Privacy, Security, Breach Notification and Enforcement Rules at 45 CFR Parts 160 and 164, and any subsequent amendments or modifications thereto, and (ii) the HITECH Act, and regulations promulgated thereunder, and any subsequent amendments or modifications thereto (together, "**HIPAA**").  As such, Trinity shall not use PHI (as defined below) in any manner except for the purpose of performing functions, activities, or services pursuant to the Agreement; provided, however, that Trinity shall not use PHI in any manner that would constitute a violation of HIPAA if so used by Aliera.  Trinity may use PHI: (i) for the proper management and administration of Trinity; (ii) to carry out the legal responsibilities of Trinity; or (iii) as required by 45 CFR § 164.103.  "**PHI**" shall have the meaning set forth in 45 CFR § 160.103, including, without limitation, any information, whether oral, electronic or recorded in any form or medium: (i) that relates to the past, present or future physical or mental condition of an individual; (ii) the provision of health care to an individual; or (iii) the past, present or future payment for the provision of health care to an individual; and (iv) that identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual.

iv.    Duties.  The Receiving Party shall protect and safeguard the confidentiality of the Disclosing Party's Confidential Information with at least the same degree of care as the Receiving Party would protect its own Confidential Information, but in no event with less than a commercially reasonable degree of care; shall not use the Disclosing Party's Confidential Information, or permit it to be accessed or used, for any purpose other than to exercise the Receiving Party's rights or to perform its obligations under this Agreement; and shall not disclose any such Confidential Information to any person or entity, except to the Receiving Party's representatives who need to know the Confidential Information to assist the Receiving Party, or act on its behalf, to exercise its rights or perform its obligations under the Agreement.

v.    Obligation for Representatives.  The Receiving Party shall be responsible for any breach of this Section 7(a) caused by any of its representatives. At the Disclosing Party's written request, the Receiving Party shall promptly return, and shall require its

**#1058.8**

representatives to return to the Disclosing Party all copies, whether in written, electronic or other form or media, of the Disclosing Party's Confidential Information, or destroy all such copies and certify in writing to the Disclosing Party that such Confidential Information has been destroyed. The Disclosing Party's Confidential Information shall be protected throughout the Term of this Agreement and for five (5) years following termination of this Agreement.

b.    <u>Non-Solicitation</u>. During the Term and for two (2) years after, each Party shall not, and shall not assist any other person to, directly or indirectly, recruit or solicit for employment or engagement as an independent contractor any person then or within the prior six (6) months employed or engaged by the other Party.

c.    <u>Remedies</u>. In addition to all other remedies available hereunder or otherwise at law, each party may seek equitable relief (including injunctive relief) against the other party and its representatives to prevent the breach or threatened breach of <u>Section 7</u> of this Agreement and to secure enforcement thereof, without need to prove actual damages or to post bond or other security.

**8.    <u>Governing Law; Venue; Waiver of Jury Trial</u>**

This Agreement shall be enforced, governed and construed in accordance with the laws of the State of Georgia, without regard to its principles governing the conflict of laws. Any judicial proceedings brought by either Party hereto must be brought in either the state or (if jurisdiction can be acquired) federal courts located in Fulton County, Georgia, and each Party consents to such venue serving as the exclusive venue for any such actions.

THE PARTIES HEREBY IRREVOCABLY WAIVE ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY ACTION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT.

**9.    <u>Miscellaneous</u>**

a.    <u>No Joint Venture</u>. The relationship of the Parties is that of independent contractors. This Agreement does not give either Party the power to direct the day to day activities of the other, constitute the Parties as partners, joint venturers, co-owners or principal-agent, or allow either Party to create or assume any obligation on behalf of the other Party.

b.    <u>Records</u>. The Parties agree to maintain all documents and records relating to members in the Plans for the earlier of five (5) years following the (i) cancelation of such member's enrollment in any Plan, or (ii) termination of this Agreement. Each Party agrees to permit the other Party (at the requesting Party's sole expense) to have reasonable access, at reasonable times and in a manner so as not to unreasonably interfere with normal business operations, to such documents and records so as to enable each Party to prepare tax, financial or court filings or reports, to respond to court orders, subpoenas or inquiries, investigations, audits or other proceedings of governmental authorities, and to prosecute and defend legal actions or for other like purposes.

9

**#1058.9**

c.    <u>Assignment</u>.  This Agreement will be binding upon and inure to the benefit of the successors and permitted assigns of the parties. No Party shall assign any of its rights or obligations under this Agreement without the prior written consent of the other Party, and any purported assignment by any Party in violation of this provision will be null and void.  Notwithstanding the foregoing, a Party may assign this Agreement to a person or entity that controls, is controlled by, or is under common control with the Party. A Party agrees to provide the other Party with at least 60 days' prior written notice in the change of ownership. control, substantial change in management or management rules and regulation of operations.

d.    <u>Severability</u>.  If any provision of this Agreement is determined by a court to be unenforceable, then the parties shall deem the provision to be modified to the extent necessary to allow it to be enforced to the extent permitted by law, or if it cannot be modified, the provision will be deleted from this Agreement, and the remainder of the Agreement will continue in effect.

e.    <u>Entire Agreement</u>.  This Agreement contains the entire understanding between the Parties with respect to the subject matter hereof and supersedes all and any prior understandings, undertakings and promises between Trinity, and Aliera whether oral or in writing.

f.    <u>Joint Negotiation</u>.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  The Parties contemplate that this Agreement will be construed as having been drafted jointly by the Parties, and no presumption or burden of proof will arise favoring or disfavoring any party based upon the authorship of any provision hereof.  Trinity acknowledges that Aliera's legal counsel does not represent and has not represented Trinity in connection with, including the negotiation of, this Agreement, and that it had the opportunity to retain its own counsel in connection with this Agreement.

g.    <u>Notices</u>.  Any notice, request or consent required or permitted hereunder must be in writing and will be deemed to have been received when hand delivered, when sent by email or fax (upon electronic confirmation of error-free delivery), one day after being sent by nationally recognized overnight courier, costs prepaid, or three days after being sent by certified or registered U.S. mail, return receipt requested, postage prepaid, in any case addressed to the recipient at its contact information listed below (or at such other address as the applicable party may designate by notice hereunder to the other parties):

> To:    Trinity HealthShare, Inc.
> 5901 Peachtree Dunwoody Rd., Suite C 160
> Atlanta, GA  30328
> Attn: William H. Thead, III, Chairman

> To:    Aliera Healthcare, Inc.
> 990 Hammond Drive
> Suite 700
> Atlanta, Georgia 30328
> Attn: Chase Moses, Executive Vice President

**#1058.10**

h.    <u>No Waiver</u>.  No failure or delay by any party to exercise any right under this Agreement will operate as a waiver of such right, and no single or partial exercise of any such right will preclude any other or further exercise of such right or the exercise of any other right.

i.    <u>Multiple Parts</u>.  This Agreement may be signed in counterparts, by facsimile and electronic signatures, and by signatures delivered electronically, each of which will be deemed an original and all of which together will constitute one instrument.

[SIGNATURE PAGE FOLLOWS]

**#1058.11**

IN WITNESS, WHEREOF, and intending to be legally bound hereby, the Parties have executed this Agreement under seal as of the date first written above.

**ALIERA HEALTHCARE, INC.**

By:

Name:  Chase Moses
Title:    Executive Vice President

**TRINITY HEALTHSHARE, INC.**

By:

Name:  William Thead, III
Title:    Chairman

*Signature Page to Services Agreement*

**#1058.12**

**EXHIBIT A**

**List of Plans**

AlieraCare – contains both Aliera and Trinity healthcare components

Interim Care – contains both Aliera and Trinity healthcare components

CarePlus – contains Trinity healthcare components only

Trinity Dental and Vision - contains Trinity healthcare components only

PrimaCare – contains Trinity healthcare components only

AD&D - TBD

Critical Illness - TBD

Accident – TBD

Hospital Indemnity - TBD

**#1058.13**

**EXHIBIT B**

**Revenue and Expense Structure**

Pursuant to that Management and Administration Agreement dated as of August 13, 2018, by and between Aliera and Trinity, the parties agree that the revenues received from the Plans, and the costs and expenses associated with the Plans, shall be allocated to each of Aliera and Trinity as set forth below or attached, until amended or changed by mutual agreement of the parties. Aliera will obtain a valuation from an independent appraiser to ensure the payments from Trinity to Aliera for Aliera's services under the Agreement are fair market value for purposes of Internal Revenue Service (IRS) rules and regulations governing excess benefit transactions in connection with non-profit organizations. Payments from Trinity to Aliera for reimbursement of vendor costs will not be considered payment of services to Aliera.

**AlieraCare & InterimCare**

Trinity acknowledges and agrees that Aliera will receive and retain 65% of the total member share contribution for each primary member of each of the AlieraCare and Interim Care plans (the "**Total Side by Side MSC**") for the Aliera components of each plan and as payment for the Services.

Trinity will receive 35% of the Total Side by Side MSC (the "**Trinity MSC**"). Trinity will reimburse Aliera, from such amount, the following fees in the following percentages for Aliera's payment of vendor cost for the AlieraCare and Interim Care plans, as well as distribute the following amounts to the ShareBox account to be used solely for member medical expense payments.

| Program Expenses<br>Side by Side Products | % of Trinity MSC |
|---|---|
| Aliera Mgmt Fee/General Overhead/Ops Labor/Internal Sales | 19.6% |
| Commissions | 30.0% |
| TPA Fees | 2.6% |
| Provider Network (Multi Plan) | 1.2% |
| Telemedicine | 0.8% |
| Total Reimbursement | 54.2% |
| ShareBox Contribution / Side by Side Products | % of Trinity MSC |
| ShareBox Member Reserve | 44.3% |

**CarePlus**

The Parties agree that Trinity will receive 100% of the total member share contribution for each primary member of each of CarePlus plans (the "**MSC**"), and potentially in the future, for the Hospital Indemnity, Critical Illness and AD&D Plans contemplated under <u>Exhibit A</u>. Trinity will reimburse Aliera, from such amount, the following fees in the following percentages for Aliera's payment of vendor cost for the CarePlus plans (and potentially in the future, for the Hospital

**#1058.14**

Indemnity, Critical Illness and AD&D Plans), as well as distribute the following amounts to the ShareBox account to be used solely for member medical expense payments.

| Program Expenses Stand Alone products | % of MSC |
|---|---|
| Aliera Mgmt. Fee/General Overhead/Ops Labor/Internal Sales | 20.0% |
| Commissions | 35.0% |
| TPA Fees | 2.5% |
| Provider Network (Multi Plan) | 1.2% |
| Telemedicine | 1.0% |
| Total Reimbursement | 59.7% |
| Share Box Contribution / Stand Alone Products | % of MSC |
| Share Box Member Reserve | 35% |

## PrimaCare

The Parties agree that Trinity will receive 100% of the total member share contribution for each primary member of each of PrimaCare (the "**PrimaCare MSC**"). Trinity will reimburse Aliera, from such amounts, the following fees in the following percentages for Aliera's payment of vendor cost for the PrimaCare plans, as well as distribute the following amounts to the ShareBox account to be used solely for member medical expense payments.

| Program Expenses Stand Alone products | % of PrimaCare MSC |
|---|---|
| Aliera Mgmt. Fee/General Overhead/Ops Labor/Internal Sales | 30.0% |
| DPCMH/Concierge Services | 15.5% |
| Commissions | 40.0% |
| TPA Fees | 2.5% |
| Provider Network (Multi Plan) | 1.2% |
| Telemedicine | 1.0% |
| Total Reimbursement | 90.20% |
| Share Box Contribution / Stand Alone Products | % of PrimaCare MSC |
| Share Box Member Reserve | 8.3% |

## Dental

The Parties agree that Trinity will receive 100% of the total member share contribution for each primary member of each of Dental plans (the "**Dental MSC**"). Trinity will reimburse Aliera, from such amount, the following fees in the following percentages for Aliera's payment of vendor cost for the Dental plans, as well as distribute the following amounts to the ShareBox account to be used solely for member medical expense payments.

| Program Expenses Stand Alone products | % of Dental MSC |
|---|---|
| Aliera Mgmt. Fee/General Overhead/Ops Labor/Internal Sales | 30.0% |
| Commissions | 40.0% |
| TPA Fees | 2.5% |
| Provider Network (Multi Plan) | 10% |

**#1058.15**

| | |
|---|---|
| Total Reimbursement | 82.5% |
| Share Box Contribution / Stand Alone Products | % of Dental MSC |
| Share Box Member Reserve | 15% |

## Vision

Further, the Parties agree that Trinity will receive 100% of the total member share contribution for each primary member of the Vision plans (the "**Vision MSC**"). Trinity will reimburse Aliera, from such amount, the following fees in the following percentages for Aliera's payment of vendor cost for the Vision plans, as well as distribute the following amounts to the ShareBox account to be used solely for member medical expense payments.

| Program Expenses<br>Stand Alone products | % of Vision MSC |
|---|---|
| Aliera Mgmt. Fee/General Overhead/Ops Labor/Internal Sales | 30.0% |
| Commissions | 40.0% |
| TPA Fees | 2.5% |
| Provider Network (Vision Fees) | 10% |
| Total Reimbursement | 82.5% |
| Share Box Contribution / Stand Alone Products | % of Vision MSC |
| Share Box Member Reserve | 15% |